Anthony J. NIEMAN, Plaintiff–Appellant,

v.

NLO, INC. and NL Industries, Inc.,
Defendants–Appellees.

No. 95–3677.

United States Court of Appeals,
Sixth Circuit.

Argued May 24, 1996.

Decided March 19, 1997.

Roger W. Healey, briefed, Stephen B. Hoffsis, argued, Buechner, Haffer, O'Connell & Meyers, Cincinnati, OH, for Plaintiff-Appellant.

William H. Hawkins, II, Frost & Jacobs, Cincinnati, OH, Kevin T. Van Wert, Lee Radford, argued and briefed, Kirkland & Ellis, Chicago, IL, for Defendants-Appellees.

Before: KRUPANSKY, DAUGHTREY, and MOORE, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. KRUPANSKY, J. (pp. 1562–69), delivered a separate dissenting opinion.

MOORE, Circuit Judge.

Appellant Anthony J. Nieman appeals the district court's grant of a motion to dismiss in favor of Appellees, NLO, Inc. ("NLO") and NL Industries, Inc. ("NLI"), pursuant to Fed.R.Civ.P. 12(b)(6) based on the expiration of the statute of limitations. For the reasons that follow, we affirm in part and reverse in part.

## I. BACKGROUND

Nieman claims that the discharge of uranium from a nuclear processing facility in Fernald, Ohio, has damaged and continues to damage his property. His complaint alleges violations of the Price–Anderson Act, 42 U.S.C. § 2210(n)(2) and (o), and various state law claims premised upon his allegation that on December 10, 1984, "a massive leak of uranium occurred at the Fernald plant." Compl. ¶ 10. Specifically, Nieman claims that appellees are liable for a "continuing trespass":

> The Defendants, by and through release of uranium into the air, into the groundwater, and into the underlying aquifer have created a trespass on the property of the Plaintiff that continues to this day and will continue into the foreseeable future.

Compl. ¶ 20. Nieman argues that because he has alleged a continuing trespass, his claim is not barred by the statute of limitations despite the fact that he had notice of the discharge by 1985, when the *In re Fernald*

litigation was filed.[1] Nieman filed the instant lawsuit on November 3, 1994.

Appellees filed a motion to dismiss or, in the alternative, for summary judgment, arguing that Nieman's claims were barred by the statute of limitations. Appellees argued that Nieman failed to allege that he was unaware of the release of uranium at or about the time it occurred in December 1984. Moreover, appellees point out that the pleadings from the *In re Fernald* litigation, a class action from which Nieman was excluded in 1986 and which asserted nearly identical claims, establish that Nieman had actual notice of his claims more than four years before he filed suit. Therefore, appellees claim that Nieman's action was barred by the four-year statute of limitations under Ohio Rev.Code § 2305.09, which both parties agree is the applicable statute of limitations.

The district court granted defendants' motion to dismiss. Finding that the damages both past and future could have been estimated in one action, the district court found that Nieman could not state a claim for "continuing trespass." Therefore, the district court applied the discovery rule, which normally dictates when a cause of action accrues:

"In the context of tort claims for seepage of water or oil, courts have typically concluded that the cause of action accrues from the date of the injury or from the date on which the injury became apparent or discoverable by due diligence." *Korgel v. United States,* 619 F.2d 16, 18 n. 4 (8th Cir.1980). Furthermore, "where all damages both past and future can be presently estimated in one action, successive actions cannot be brought for recurring or continuing damages." *Id.* at 18; *see also Hamo v. Exxon Corp.,* slip op. no. 1143, at 1, 1982 WL 5760 (Ohio Ct.App.1982) ("Assuming that the damage is continuing, this still would not extend the four year Statute of Limitations. The Statute of Limitations, 2305.09, provides that in an action for trespassing underground, the cause accrues when the wrongdoer is discovered.").

District Court Opinion ("Dist.Ct.Op.") at 3–4. In determining that the damages both past and future could have been estimated in one action, the district court relied on the settlement in the class action lawsuit from which Nieman, because he was a former NLO employee, had been excluded, *In re Fernald.* The court also noted that the "allegation that the violation is continuing is suspect" because NLO ended its operation of the Feed Materials Production Center ("FMPC") in 1985, but the court declined to decide this issue because it found that Nieman's complaint was untimely for the alternative reasons stated above. Dist.Ct.Op. at 4 & n. 3.

## II. STANDARD OF REVIEW

■ We review de novo a district court's dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Furthermore, we construe the complaint in the light most favorable to the plaintiff, accept as true all well-pleaded factual allegations, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *Columbia Natural Resources, Inc. v. Tatum,* 58 F.3d 1101, 1109 (6th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1041, 134 L.Ed.2d 189 (1996).

## III. ANALYSIS

### A. Jurisdiction

■ Although the parties do not raise this issue, we begin our analysis with the question whether we may exercise subject matter jurisdiction over public liability actions under the Price–Anderson Act. Section 2210(n)(2) explicitly allows for removal of public liability actions to federal court. However, it has been argued that since "the substantive rules for decision" in public liability actions are "derived from" state law rather than federal law, 42 U.S.C. § 2014(hh), the claim does not arise under a law of the United States, and therefore federal question subject matter jurisdiction is not present. At least two courts of appeals have rejected this argument and held that the Price–Anderson Act

---

1. The *In re Fernald Litigation* will be addressed further *infra.* *See In re Fernald Litigation,* 1989

WL 267039 (S.D.Ohio 1989).

as amended provides for a federal claim and affords federal question subject matter jurisdiction. *See O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1100 (7th Cir.), *cert. denied,* 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994); *Brannon v. Babcock & Wilcox Co. (In re TMI Litig. Cases Consol. II) ("TMI II"),* 940 F.2d 832, 857 (3d Cir. 1991) (holding that the Amendments Act "while relying for definition upon state law elements, contains the federal components necessary to survive the constitutional challenge mounted"), *cert. denied,* 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992), *aff'd in part and rev'd in part on other grounds,* 67 F.3d 1103, 1106 (3d Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1034, 134 L.Ed.2d 111 (1996). We agree with the analysis in *O'Conner* and *TMI II* holding that federal question subject matter jurisdiction does exist.

As will be discussed further below in relation to the merits of this appeal, the Price–Anderson Act, as amended ("Amendments Act"), does not merely transfer to federal court a state cause of action; rather, "a new federal cause of action supplants the prior state cause of action." *O'Conner,* 13 F.3d at 1100. Although Congress provided that the law governing a public liability action under the Price–Anderson Act is derived from state law, Congress did not adopt state law in "wholesale fashion." *Id.* Pursuant to 42 U.S.C. § 2014(hh), a subsection added to the Act in 1988, state law provides the substantive rules for decision in any public liability action only to the extent such law is not inconsistent with the provisions in § 2210. Thus, "Congress recognized that state law would operate in the context of a complex federal scheme which would mold and shape any cause of action grounded in state law." *O'Conner,* 13 F.3d at 1100. In the Amendments Act, "Congress ensured that all claims resulting from a given nuclear incident would be governed by the same law, provided for the coordination of all phases of litigation and the orderly distribution of funds, and assured the preservation of sufficient funds for victims whose injuries may not become manifest until long after the incident." *TMI II,* 940

F.2d at 857. Thus, we conclude, as have the Third and Seventh Circuits, that the federal ingredients in the Amendments Act are sufficient to satisfy the jurisdictional requirements of Article III.

## B. Preemption

This court must also consider at the outset whether the Price–Anderson Act preempts Nieman's state law claim for continuing trespass, the only potentially viable state law claim in his complaint. The parties raised this issue for the first time at oral argument, and therefore the district court did not address it below.

### 1. The Statutory Language

Our analysis must begin with the statute itself. Congress enacted the Price–Anderson Act ("the Act") in 1957 as an amendment to the Atomic Energy Act ("AEA") "to encourage private sector investment in the development of nuclear power by limiting the liability of private owners and operators in the event of a nuclear incident." *Day v. NLO, Inc.,* 3 F.3d 153, 154 n. 1 (6th Cir.1993). The Act requires private owners and operators "to purchase a specified amount of insurance, and damages awards over and above that amount are then indemnified by the government." *Id.* In 1988, Congress enacted the Price–Anderson Amendments Act of 1988, Pub.L. No. 100–408, 102 Stat. 1066 (1988), which explicitly created a federal cause of action for "public liability actions" that arise from nuclear incidents. *See* 42 U.S.C. § 2014(hh). Congress granted jurisdiction to the federal courts over these actions and provided that actions filed in state court were subject to removal. 42 U.S.C. § 2210(n)(2). However, "[t]he amendment was not intended to alter the state law nature of the underlying tort claims." *Day,* 3 F.3d at 154 n. 1 (citing § 2014(hh)).

Nieman alleges that a uranium leak occurred at the Fernald Plant on or about December 10, 1984. Compl. ¶ 10. He claims that the uranium leak was an extraordinary nuclear occurrence ("ENO")[2] or, alternative-

---

**2.** An ENO is defined as

any event causing a discharge or dispersal of

ly, a nuclear incident, as those terms are defined by 42 U.S.C. §§ 2014(j) and (q), respectively. Compl. ¶ 27–28. A "nuclear incident" is "any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material...." 42 U.S.C. § 2014(q).[3] Any legal liability arising out of or resulting from a "nuclear incident," with certain exceptions not relevant here, is deemed a "public liability." 42 U.S.C. § 2014(w). "The term 'public liability action', as used in section 2210 of [title 42], means any suit asserting public liability." 42 U.S.C. § 2014(hh). Section 2014(hh) provides that "the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of [section 2210]." Thus, the plain language of the statute as amended in 1988 incorporates the law of the state in which the nuclear incident occurs to the extent it is not inconsistent with the Price–Anderson Act.[4] However, the statute does not explicitly address the issue of preemption.

## 2. Supreme Court Analysis of Preemption

Although there is no Supreme Court precedent that controls in the instant case, the Court has faced issues of preemption in the context of the regulation of nuclear activity. In *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752

(1983), the Supreme Court ruled that by enacting the Atomic Energy Act, Congress "intended that the federal government should regulate the radiological safety aspects involved in the construction and operation of a nuclear plant." *Id.* at 205, 103 S.Ct. at 1723. Therefore, the Court concluded that "the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." *Id.* at 212, 103 S.Ct. at 1726. Nonetheless, the Court held that the AEA did not preempt a California law that imposed a moratorium on construction of nuclear power plants in California until the federal government approved technology for the disposal of high level nuclear waste. *Id.* at 223, 103 S.Ct. at 1732. California had asserted that it would be fiscally imprudent to permit further construction without a federally-approved waste disposal method. *Id.* at 213–14, 103 S.Ct. at 1727–28. The Court reasoned that federal law did not preempt the California statute because it dealt with economic concerns, not safety standards.

In *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), the Supreme Court held that the AEA did not preclude an award of punitive damages under state law. In *Silkwood*, the executor of Karen Silkwood's estate brought an action in federal court seeking relief for personal injuries and damage to her apartment resulting from Silkwood's alleged exposure to radiation during the course of her employment at the Kerr–McGee plant. *Id.* at 243, 104 S.Ct. at 618. The jury returned a verdict awarding Silkwood's estate compensatory and punitive damages. *Id.* at 245, 104 S.Ct. at 619. Kerr–McGee appealed, and the Tenth Circuit held that federal regulation of

---

source, special nuclear, or byproduct material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines to be substantial, and which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines has resulted or will probably result in substantial damages to persons offsite or property offsite.
42 U.S.C. § 2014(j). The record in this case does not reflect whether the NRC or the Secretary of

Energy designated as an ENO the uranium leak at the Fernald Plant in December 1984.

**3.** "Source material" includes uranium. 42 U.S.C. § 2014(z).

**4.** Congress explicitly provided that § 2014(hh) "shall apply to nuclear incidents occurring before, on, or after the date of enactment [1988]." Pub.L. 100–408, § 20(b)(1). *See O'Conner*, 13 F.3d at 1102.

nuclear safety preempted a state law awarding punitive damages. The Supreme Court reversed.[5] *Id.* at 249–50, 104 S.Ct. at 621–22. The Court stated that state law generally could be preempted in either of two ways:

■ If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted [and] [2] If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Id.* at 248, 104 S.Ct. at 621 (citations omitted). Despite the preemption of state law relating to the safety aspects of nuclear development, the Supreme Court reasoned that "the only congressional discussion concerning the relationship between the Atomic Energy Act and state tort remedies indicates that Congress assumed that such remedies would be available." *Id.* at 251, 104 S.Ct. at 623; *see Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 186, 108 S.Ct. 1704, 1712, 100 L.Ed.2d 158 (1988) (characterizing *Silkwood* as finding that "Congress was willing to accept regulatory consequences of application of state tort law to radiation hazards even though direct state regulation of safety aspects of nuclear energy was pre-empted").

In *Goodyear Atomic,* the Supreme Court again faced the issue whether federal law preempted a state law regulating the safety of nuclear power. The plaintiff was an employee at a plant owned by the United States but operated by Goodyear Atomic under a contract with the Department of Energy. The plaintiff, a maintenance mechanic, fractured his ankle when he fell from a government-owned scaffold after his glove caught on a protruding bolt. *Id.* at 176, 108 S.Ct. at 1707. Plaintiff applied to the Ohio Industrial Commission for a workers' compensation award and also alleged that Goodyear Atomic had failed to comply with a state safety regulation, which meant he was entitled to a supplemental award. *Id.* at 176–77, 108 S.Ct. at 1707–08. The Court held that a provision in the Ohio Constitution granting a supplemental workers' compensation award when an employer violates state safety standards[6] could be applied to a nuclear weapons plant because a 1936 federal statute provided for the general application of state workers' compensation laws to federal facilities. *Id.* at 182, 108 S.Ct. at 1710 (citing 40 U.S.C. § 290 (1988)).[7] The Court reasoned that Congress is presumed to know existing law pertinent to the legislation it enacts. *Id.* at 184–85, 108 S.Ct. at 1711–12. Although the Court also reasoned that the Ohio provision was only "incidental" rather than direct regulation of a nuclear facility, the Court upheld the Ohio provision under the Supremacy Clause because of Congress's unambiguous statutory

---

**5.** *Silkwood's* holding, allowing the punitive damages award to stand, was overruled by the 1988 Amendments to the Price–Anderson Act, which specifically bar punitive damages. *See* 42 U.S.C. § 2210(s) ("No court may award punitive damages in any action with respect to a nuclear incident or precautionary evacuation against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident or evacuation."); *O'Conner,* 13 F.3d at 1105 n. 13 (noting punitive damages bar in Amendments Act).

**6.** The Ohio Constitution provides that when an injury results from an employer's failure to comply with a specific state health or safety requirement, the Ohio Industrial Commission is authorized to award to an employee an additional fifteen to fifty percent of the benefits already received. *Id.* at 177, 108 S.Ct. at 1707 (citing Ohio Const. Art. II. § 35).

**7.** 40 U.S.C. § 290 provides:

Whatsoever constituted authority of each of the several States is charged with the enforcement of and requiring compliances with the State workmen's compensation laws of said States and with the enforcement of and requiring compliance with the orders, decisions, and awards of said constituted authority of said States shall have the power and authority to apply such laws to all lands and premises owned or held by the United States of America ... and to all projects, buildings, constructions, improvements, and property belonging to the United States of America ... in the same way and to the same extent as if said premises were under the exclusive jurisdiction of the State within whose exterior boundaries such place may be.

authorization in 40 U.S.C. § 290. *Id.* at 182, 186, 108 S.Ct. at 1710, 1712.

Thus, while recognizing that Congress has preempted the entire field of nuclear safety regulation, the Supreme Court has been willing to uphold the application of state law where it affects nuclear regulation only indirectly, i.e., where state law amounted to economic regulation, or where a federal statute explicitly dictated that a state law remedy applies in a particular context. Moreover, the Court has not had occasion to address § 2014(hh), a provision added in the 1988 amendments to the Price–Anderson Act, which clarified the relationship between state and federal law by explicitly incorporating state law into the Amendments Act except to the extent the state law is inconsistent with § 2210.[8] Accordingly, there is no Supreme Court precedent exactly on point.

### 3. Other Circuits' Analysis of Preemption

Two courts of appeals have recently concluded that the Price–Anderson Act, as amended in 1988, preempts state law claims. In *O'Conner*, the Seventh Circuit affirmed the district court's holding that under the Price–Anderson Act, as amended, the applicable standard of care would be determined by federal regulations and "a different standard would be preempted by federal law." 13 F.3d at 1094. In the context of deciding that the federal court had subject matter jurisdiction under Article III over an action arising under the Price–Anderson Act, the

Seventh Circuit reasoned that "a state cause of action is not merely transferred to federal court; instead, a new federal cause of action supplants the prior state cause of action." *Id.* at 1099–1100. The Seventh Circuit further reasoned that

> Congress did not adopt in wholesale fashion state law. State law serves as the basis for the cause of action only as long as state law is consistent with the other parts of the Act. Congress desired that state law provide the content for and operate as federal law; however, Congress recognized that state law would operate in the context of a complex federal scheme which would mold and shape any cause of action grounded in state law. . . . [A]lthough the basis for a public liability cause of action is state law, the applicable law is only "derived" from state law. The Price–Anderson system, by design, alters state tort law to forward the goals of that act.

*Id.* at 1100.

Similarly in *TMI II*, the Third Circuit held that "[a]fter the Amendments Act, no state cause of action based on public liability exists. A claim growing out of any nuclear incident is compensable under the terms of the Amendments Act or it is not compensable at all." 940 F.2d at 854. In concluding that the court had jurisdiction over Price–Anderson Act claims under Article III, the Third Circuit reasoned that "Congress clearly intended to supplant all possible state causes of action when the factual prerequisite

---

**8.** Previously, the relationship between state and federal law was less explicit. In discussing the background and purpose of the Price–Anderson Act, the *Silkwood* Court stated that the discussion preceding the enactment of the Price–Anderson Act and its subsequent amendment "indicates that Congress assumed that persons injured by nuclear accidents were free to utilize existing state tort law remedies." 464 U.S. at 252, 104 S.Ct. at 623. The *Silkwood* Court quoted the Joint Committee Report on the original version of the Price–Anderson Act to explain the relationship between the Act and existing state tort law:

> "Since the rights of third parties who are injured are established by State law, there is no interference with the State law until there is a likelihood that the damages exceed the amount of financial responsibility required together with the amount of the indemnity. At that point the Federal interference is limited to the

> prohibition of making payments through the State courts and to prorating the proceeds available."

*Id.* (quoting S.Rep. No. 85–296, at 9 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1803, 1810); *see* S.Rep. No. 89–1605, at 5 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3201, 3206. The Court also noted that Congress "began working on the Price–Anderson legislation with the assumption that in the absence of some subsequent legislative action, state tort law would apply." *Id.* Thus, when it enacted the Price–Anderson Act, Congress intended to encourage national safety regulation, "[b]ut, at the same time,'the right of the State courts to establish the liability of the persons involved in the normal way [was] maintained.'" *Silkwood*, 464 U.S. at 253, 104 S.Ct. at 623 (quoting S.Rep. No. 85–296, at 22 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1803, 1823).

of the statute are met." *Id.* at 857. The court also stated that "states are preempted from imposing a non-federal duty in tort, because any state duty would infringe upon pervasive federal regulation in the field of nuclear safety, and thus would conflict with federal law." *Id.* at 859; *see also TMI,* 67 F.3d at 1106 (affirming the district court's determination that federal law determines the standard of care and preempts state tort law); *Lujan v. Regents,* 69 F.3d 1511, 1513 (10th Cir.1995) (noting that the plaintiff had not appealed the district court's holding that the plaintiff's state law claims premised on exposure to radioactive substances were preempted by Price–Anderson).

◼ Because the Price–Anderson Act, as amended in 1988, specifically dictates that state law applies only to the extent it is not inconsistent with federal law and because we agree with the analyses of preemption in *O'Conner* and *TMI II,* we hold that the Price–Anderson Act preempts Nieman's state law claims; the state law claims cannot stand as separate causes of action. Nieman can sue under the Price–Anderson Act, as amended, or not at all. His federal claim will be derived from state law, as mandated by § 2014(hh), to the extent it is not inconsistent with federal law. Therefore, our present task, in the posture of review of the district court's grant of defendants' motion to dismiss, is limited to considering whether, viewing the well-pleaded allegations in the complaint in the light most favorable to Nieman, his continuing trespass claim is timely under the Price–Anderson Act.

**C. Nieman's Price–Anderson Act Claim**

Based on § 2014(hh), the parties in the instant case agree that under the Price–Anderson Act, Ohio law provides the limitations period. However, they disagree as to whether state law or federal law should be used to determine when the statute of limitations begins to run.[9]

◼ This court recently encountered a similar issue in *Huffman v. United States,* 82 F.3d 703 (6th Cir.1996), where we reversed the grant of summary judgment to the defendant in a case alleging a temporary nuisance under the Federal Tort Claims Act ("FTCA"). "The FTCA statute of limitations requires that a claim be presented against the government within two years 'after such claim accrues.'" *Id.* at 705 (citing 28 U.S.C. § 2401(b)). Like the Price–Anderson Act, the FTCA incorporates state tort law so that the federal government is "liable in tort in the same manner and to the same extent that state law would impose on a private individual in similar circumstances." *Huffman,* 82 F.3d at 705 (citing 28 U.S.C. § 2674). Therefore, the *Huffman* court held that state law "both provides the cause of action and governs the application of the FTCA's two-year statute of limitations." *Huffman,* 82 F.3d at 705 (citing *Arcade Water Dist. v. United States,* 940 F.2d 1265 (9th Cir.1991) (discussing state law concepts of permanent and temporary nuisance in the context of the FTCA statute of limitations)). Because there existed genuine issues of material fact as to whether the alleged nuisance was temporary (and therefore not time-barred under Kentucky law) or permanent (and hence time-barred), the court reversed the grant of summary judgment. *Huffman,* 82 F.3d at 705–06. Following our precedent in *Huffman,* we must apply Ohio state law principles to determine when the Ohio limitations period begins to run.

**D. Consideration of the *In re Fernald* Settlement**

◼ The district court found that Nieman had not alleged a continuing violation because all damages both past and future could

---

9. The parties phrase the issue as one of determining when the claim accrues. *See* Appellant's brief at 3; Appellees' brief at 11. Accrual of a cause of action for continuing trespass, i.e., the date when suit may first be maintained for that claim, does not necessarily trigger the running of the statute of limitations because the continuing trespass theory allows a plaintiff to bring an action immediately upon accrual of the original trespass or to bring successive actions at his or her option. *See* RESTATEMENT (SECOND) OF TORTS § 161 cmt. b (1965) (quoted *infra*). Therefore, accrual is not the precise term. As indicated above, we must decide whether Nieman's claim is time-barred, i.e., when the statute of limitations began to run on the claims asserted in his complaint filed in November 1994.

have been estimated in one action. Dist.Ct. Op. at 4. However, the district court made this determination based on the settlement in *In re Fernald*, No. C–1–85–149, 1989 WL 267039 (S.D.Ohio September 29, 1989). Generally, when a party moves to dismiss an action under Fed.R.Civ.P. 12(b)(6), the court may only consider the pleadings:

> If, on a motion asserting the defense numbered (6) ... matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b); *see Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir.1993); 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed. 1990) ("In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account."). Nonetheless, it is not necessary for this court to determine whether the district court erred by considering the settlement as a matter outside the pleadings in granting the defendants' motion to dismiss, because the fact that the defendants reached a settlement with different plaintiffs in the class action case does not conclusively establish that all damages past and future could be estimated in one action.

In fact, a settlement generally does not establish anything except that the parties decided they would prefer avoiding further litigation. In the class action context, a settlement must be approved by the court pursuant to Fed.R.Civ.P. 23(e) before the case may be dismissed. *In re Fernald*, 1989 WL 267039, *3 (S.D.Ohio September 29, 1989). As part of the approval process, the district court "must determine whether the proposed

settlement is fair, reasonable, and adequate." *Id.* In the instant case, the district court approved the settlement based on numerous factors, including the plaintiffs' needs for immediate medical monitoring and epidemiological studies, which the court found might be frustrated by lengthy appeals even if plaintiffs prevailed at trial. *Id.* at *4–5. The district court's order approving the settlement does not indicate that plaintiffs attempted to argue a continuing trespass theory, which is not surprising since the class action litigation was filed in 1985, or within approximately one year of the uranium leak at the Fernald plant. *See* Compl. ¶ 10.[10] In addition, the fact that other members of Nieman's family were members of the class is irrelevant. *See* Dist.Ct.Op. at 1 & n. 1.

Accordingly, we reject the district court's conclusion that Nieman failed to state a claim for continuing trespass based on its finding that the *In re Fernald* settlement established that any trespass was a permanent one. Therefore, we must consider whether Nieman's allegations are sufficient to state a timely claim under the Price–Anderson Act for continuing trespass. As stated earlier, to the extent it is not inconsistent with federal law, Ohio law provides the framework for this federal claim.

### E. Continuing Trespass Under Ohio Law

Appellees argue that continued ownership or control of the plant is a prerequisite for a claim of continuing trespass because the cause of action requires continuing wrongful conduct, not just continuing damages caused by the original conduct. Therefore, appellees claim that since NLO ended its operation of the FMPC in 1985, Nieman cannot state a claim against them.

As a preliminary matter, we note that Nieman's complaint does not allege that NLO ended its operation of the FMPC in 1985. Rather, appellees argue this fact was established by the class action complaint and

---

**10.** Even if the district court had made such a determination in approving the settlement, or alternatively, even if there had been an adjudication on the merits in the class action lawsuit that the trespass was permanent because all past and

future damages could be estimated in one action, Nieman could not be precluded from litigating these issues based on issue or claim preclusion since he had been excluded from the class in the earlier lawsuit.

amended class action complaint. Appellees' brief at 14. This raises again the question whether the district court has impermissibly considered a matter outside the pleadings in deciding defendants' motion to dismiss. Appellees argue that the first paragraph of Nieman's complaint mentions the class action complaint and, therefore, the class action complaint is not a matter outside the pleadings. Nieman's complaint states that he "was not a compensated class member in Case No. C–85–0149. . . ." Compl. ¶ 1. Federal Rule of Civil Procedure 10(c) provides that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Moreover, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993).

Nieman does not explicitly argue that we may not consider the fact that NLO ceased operations at the FMPC in 1985 as an alternative basis for the dismissal because doing so would require consideration of matters outside the pleadings. Rather, Nieman contends that the question of when NLO ceased to manage the FMPC is irrelevant as a matter of law. The district court apparently disagreed, but declined to decide the motion to dismiss on this basis. *See* Dist.Ct.Op. at 4 n. 3. Assuming we may consider the fact that NLO ended its operation of the FMPC in 1985 as a potential alternative ground for the district court's decision, the crucial question becomes whether continuing *conduct* is necessary to show a continuing trespass, as appellees contend, or whether it is sufficient to show continuing *harm* or *damages* caused by conduct that preceded the lawsuit by a period longer than the statute of limitations. As indicated above, based on *Huffman,* we look to Ohio law on this issue.

*Boll v. Griffith,* 41 Ohio App.3d 356, 535 N.E.2d 1375 (1987), supports Nieman's view that a showing of continuing damages will suffice. In *Boll,* defendant Robert Griffith hired a third party in 1978 to remove a structure on his property, which was connected by a common brick wall with the plaintiff's property. *Id.,* 535 N.E.2d at 1376. In 1979, Griffith conveyed his property to defendant Edna Waldo. *Id.* The plaintiff alleged that when Griffith removed the structure from the other side of the party wall, remnants of the razed structures remained attached to the party wall, and their weight gradually damaged the wall. *Id.* The plaintiff filed suit more than four years after Griffith's conduct (and presumably more than four years after Griffith sold the property).[11] The trial court dismissed the plaintiff's complaint on the basis that the plaintiff's claims were time-barred under Ohio Rev.Code § 2305.09(D). *Id.* at 1375–76. On appeal, the plaintiff argued that the constant presence of materials affixed to the brick wall after the razing constituted a continuing trespass, and therefore his complaint should not have been dismissed. Defendant Griffith contended that a single mistake in demolition of a structure should not constitute a continuing trespass. The Ohio Court of Appeals rejected Griffith's argument and held that the plaintiff's complaint had stated a claim for continuing trespass. *Id.* at 1377. Thus, in *Boll,* the court found a continuing trespass even though Griffith's last act preceded the lawsuit by more than four years and Griffith no longer owned or controlled the property during the relevant time period.[12]

---

**11.** The opinion does not state when plaintiff filed the action, but it is a 1987 opinion and the property was conveyed in 1979.

**12.** The dissent states at page 1567 that in *Boll* "the defendant's continual unlawful act was his failure to extract tangible, moveable matter from the plaintiff's real estate which he (the defendant) at all times had a duty to remove." As indicated above, it is not clear that the defendant in *Boll* owned the property during any of the four years preceding the filing of the action for continuing trespass; therefore, if the dissent anchors its view that the defendant has an ongoing duty to remove the waste based on property ownership, the *Boll* opinion is unclear on this point. To the extent that the ongoing duty is based on the premise that the defendant was responsible for the removal of the waste because the defendant was responsible for the demolition that caused the debris, *Boll* is indistinguishable from the instant case.

The dissent focuses on the fact that the defendant in *Boll* failed to remove "tangible matter" as if to suggest that the concrete nature of the debris constituting the trespass in *Boll* distin-

The *Boll* court relied on *Valley Ry. Co. v. Franz,* 43 Ohio St. 623, 4 N.E. 88 (1885), in which the defendant had diverted a river by constructing a dam and an artificial channel on its own land in November 1874, which gradually caused damage by wearing away at the bank at the portion of river on the plaintiff's property. *Id.,* 4 N.E. at 91–92. The plaintiff commenced the action in 1881. The defendant railway company argued that the plaintiff's claim should be barred by the four-year statute of limitations because the railway company acted only in November 1874 to cause the injury. *Id.* at 90. Rejecting this argument, the Ohio Supreme Court held that the complaint was not time barred. *Id.* at 92. Appellees attempt to distinguish this case by arguing that the court allowed the plaintiff's continuing trespass claim in *Franz* only because it found that the defendant continuously "controlled and directed the stream that has caused the damage complained of." *Id.* But *Franz* did not squarely face the issue whether a claim for continuing trespass *requires* the plaintiff to show that the defendant owned or controlled the property within the four years preceding the filing of the complaint.

More important, the Ohio Supreme Court implicitly found that a claim for continuing damages is sufficient, because the defendant railway company built the dam seven years before the plaintiff filed his lawsuit. In *Franz,* the Ohio Supreme Court summarized the law in the area of continuing trespass and nuisance as follows:

> And when the owner of land rightly and lawfully does an act entirely on his own land, and by means of such act puts in action or directs a force against or upon, or that affects, another's land, without such other's consent or permission, such owner and actor is liable to such other for the damages thereby so caused the latter, and at once a cause of action accrues for such damages; and *such force, if so continued,*

*is continued by the act of such owner and actor,* and it may be regarded as a continuing trespass or nuisance; and each additional damage thereby caused is caused by him, and is an additional cause of action; and, until such continued trespass or nuisance by adverse use ripens into and becomes a presumptive right and estate in the former, the latter may bring his action.

*Id.* at 91 (emphasis added). Appellees cite a portion of this passage to support their position that under Ohio law, a trespass only continues if the conduct of the original actor also continues. Appellees' brief at 15. However, appellees misread the passage, which properly should be interpreted to read "such force, if so continued, is *deemed* continued by the act of such owner and actor."

Other Ohio cases similarly support Nieman's position. In *Wood v. American Aggregates Corp.,* 67 Ohio App.3d 41, 585 N.E.2d 970, 973 (1990), the focus is on continuing damages, not continuing conduct. The plaintiffs sued the defendant quarry owner alleging that its use of underground water caused the water from the plaintiffs' well to decline in quality and quantity. *Id.,* 585 N.E.2d at 972. The relevant time line includes the following dates: the quarry began operating in 1973, the plaintiffs noticed problems with their water supply "shortly thereafter," the plaintiffs stopped using their well altogether when they moved in 1980, the plaintiffs eventually were forced to have their home connected to Columbus city water when it became available in 1982, and the plaintiffs filed their complaint in 1988. *Id.* The trial court granted the defendant's motion for summary judgment because it found that since the latest date that damages occurred was 1982, the plaintiffs' claims were barred by the four-year statute of limitations. *Id.* The Ohio Court of Appeals reversed. *Id.* at 973. The court reasoned that the plaintiffs' damages were arguably ongoing in nature because the defendant had not demonstrated that the

guishes it from the instant case. However, as described below, in *Boll,* the Ohio Court of Appeals relies heavily on an 1885 Ohio Supreme Court decision holding that diversion of a river caused a continuing trespass. Furthermore, the dissent has not cited any authority for the proposition that the release of uranium, which we presume the dissent would describe as "intangible," should be treated differently than the removal of tangible debris from a party wall. In both instances, the conduct causing the trespass has already ceased, and the determination of whether the trespass is continuing depends on whether it is abatable.

plaintiffs ceased to incur damages once city water was connected to appellants' property. *Id.* This case did not indicate whether the defendant continued to own and/or operate the quarry, but the court's reasoning clearly focused on ongoing *damages,* not conduct.

The definition of "continuing trespass" in the RESTATEMENT (SECOND) OF TORTS also supports Nieman's view:

> A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it.

RESTATEMENT (SECOND) OF TORTS § 161(1) (1965). Likewise, the comments to this section focus on the actor's failure to remove from another's land the thing which the actor has tortiously placed there:

> The actor's failure to remove from land in the possession of another a structure, chattel, or other thing which he has tortiously ... placed on the land constitutes a continuing trespass for the entire time during which the thing is wrongfully on the land and ... confers on the possessor of the land an option to maintain a succession of actions based on the theory of continuing trespass or to treat the continuance of the thing on the land as an aggravation of the original trespass....

*Id.* cmt. b; *see also id.* cmt. c ("Since the conduct of the actor in placing the thing on the land is tortious, his responsibility for its presence on the land continues ... although through subsequent conduct on his part it has now become impossible or impracticable for him to terminate the intrusion on the other's land.").

 Similarly, § 899 of the RESTATEMENT (SECOND) OF TORTS supports the view that proof of continuing harm suffices to establish a continuing trespass:

> When there is a continuing trespass, such as that caused by the erection of a structure upon the land of another or when there is a series of harms caused by the existence of a structure or by the operation of a business outside the land, the time when the statute of limitations begins to run depends on the rules stated in § 161 (continuing trespass) and those stated in § 930.

RESTATEMENT (SECOND) OF TORTS § 899 cmt. d (1979). Comment d also states that "when there is a series of continuing harms the plaintiff, under the rules stated in § 161 and § 930, has an election to recover or is permitted to recover damages only for harm to the use of the land up to the time of trial. In cases of this type, the statute does not run from the time of the first harm except for the harm then caused." *Id.* Section 930, which addresses "Damages for Future Invasions," also does not preclude the view that a plaintiff need not show continuing conduct to state a claim for continuing trespass:

> If one causes continuing or recurrent tortious invasions on the land of another by the maintenance of a structure or acts or operations not on the land of the other and it appears that the invasions will continue indefinitely, the other may at his election recover damages for the future invasions in the same action as that for the past invasions.

RESTATEMENT (SECOND) OF TORTS § 930(1) (1979). Moreover, the comments to section 930 provide that "for continuing wrongs the injured person can ordinarily bring successive actions for the invasions or series of invasions as they occur." *Id.* cmt. a. Thus, under the Restatement, a claim for continuing trespass is not defeated where the defendant's last affirmative act of wrongdoing precedes the filing of the complaint by a period longer than the statute of limitations.[13]

13. The dissent cites 54 C.J.S. *Limitations of Actions* § 177 (1987), a section entitled "Continuing or Repeated Injury in General," which states that "[a] 'continuing tort' is one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation, and for there to be a continuing tort there must be a continuing duty." To the extent that the provisions in the RESTATEMENT (SECOND) OF TORTS cited above conflict with material in Corpus Juris Secundum, we find the former source more authoritative. Moreover, we note that 54 C.J.S. *Limitations of Actions* § 182, a section entitled "Injury from Percolation or Seepage," provides

Appellees cite the unpublished decision, *Reeser v. Weaver Bros., Inc.,* 1995 WL 386849 (Ohio Ct.App. May 1, 1995), *appeal not allowed,* 74 Ohio St.3d 1464, 656 N.E.2d 1299 (1995), in support of their argument that a claim for continuing trespass must include an allegation of actionable conduct by a defendant within the four years preceding the filing of the complaint. In *Reeser,* the defendant began an egg production operation in 1984 that was located directly upstream from the plaintiff's property. By 1985, the chicken operations produced over a million pounds of organic waste matter, and within one year, all the fish and other living organisms in the plaintiff's lake died. Appellees assert that the *Reeser* court "held that the plaintiffs could not bring a complaint for a continuing tort in 1991 where there had been no additional acts causing pollution or damage since 1985, more than four years previous to the filing of the complaint." Appellees' brief at 16. But the appellees mischaracterize the court's holding. The *Reeser* court affirmed the grant of summary judgment against the plaintiff because the plaintiff did not bring "evidence to show that the nuisance was continuing or that damages were recurring over the period alleged in the complaint." *Id.* at *6. In fact, the plaintiff in *Reeser* failed to respond to the defendant's motion for summary judgment. *Id.* at *2. The trial court relied on the plaintiff's testimony from a prior trial in a related case that she was unaware of any additional pollution other than the fish kill in 1985. *Id.* at *3. Moreover, *Reeser* dealt with the requisite proof at the summary judgment stage. Accordingly, this unpublished case is inapposite as well as nonprecedential.

Appellees also cite *Carter v. American Aggregates Corp.,* 82 Ohio App.3d 181, 611 N.E.2d 512 (1992), in support of their "continuing conduct" argument. In *Carter,* the defendant allegedly interfered with the underground water supply upon which plaintiffs relied for well water. The defendant began pumping the underground water in 1973 in order to mine sand, gravel, and limestone and had continuously pumped water since that time. Upon purchasing their property in 1979, the plaintiffs had an adequate water supply until August 1980 when their well became dry. Finally, plaintiffs drilled a new well in 1982. However, the plaintiffs did not file their complaint until 1988. The Court of Appeals affirmed the trial court's grant of summary judgment in favor of the defendant based on the statute of limitations. *Id.,* 611 N.E.2d at 516. But the appellees fail to mention one fact essential to the court's holding: the plaintiffs conceded that they had suffered no compensable injuries since 1982 when they drilled the second well. *Id.* at 514. In addition, the court states that "with respect to a continuing tort, the cause of action accrues when injury is caused to the plaintiff." *Id.* at 516. Thus, *Carter* does not support appellees' position.

Finally, appellees rely on the unpublished decision of the Ohio Court of Appeals in *Hamo v. Exxon Corp.,* 1982 WL 5760 (Ohio. Ct.App. May 28, 1982), a case which is factually analogous and appears to be wrong on the law. The district court also relied on this

---

that "[l]imitations affecting a cause of action for damage from percolation or seepage ordinarily run from the date of injury." Section 182 further states that

Where the statutory period of limitations has run since seepage first occurred, the question whether the action then accrued so as to start limitations running will depend on whether the first seepage created a single cause of action or whether successive actions may be maintained for repeated or recurring injuries, and this turns on the further question whether the trespass is to be regarded as a permanent or a continuing trespass.....

\* \* \* \* \* \*

Where there is a continuing seepage causing continuing injury, it has been held that the cause of action accrues at the date of the first seepage but may be enforced at any time within the prescriptive period following the last seepage as far as injuries sustained during such period are concerned.

Thus, § 182 supports our view that the viability of Nieman's cause of action for continuing trespass will depend in part on whether he can ultimately establish that the trespass is continuing, not permanent.

case. In *Hamo*, Exxon's gas tank broke in 1972, allowing gasoline to seep underground and into the next door property where Hamo was a tenant. The owner and Hamo presented at some unspecified point a claim to Exxon, but the claim was not paid. *Id.* at *1. Upon buying the property in 1976, Hamo discovered further seepage, but he did not bring suit until 1978. The court summarily affirmed the trial court's grant of judgment in favor of Exxon based on the expiration of the four-year statute of limitations. *Id.* The court did not discuss the cause of action for "continuing trespass" but merely stated "[a]ssuming that the damage is continuing, this still would not extend the four year Statute of Limitations." *Id.* This opinion cannot be an accurate statement of Ohio law unless we find that there is no such action as "continuing trespass." If the accrual of a cause of action for continuing trespass were the same as the accrual of a cause of action for permanent trespass, there would be no need for different causes of actions (except perhaps for the assessment of different types of damages). *Hamo* is unpublished and therefore under Ohio law entitled to no precedential weight. *See* Ohio Supreme Court Rules for the Reporting of Opinions 2(G)(1) (an "unpublished opinion shall not be considered controlling authority in the judicial district in which it was decided except between the parties thereto"). It is also contrary to the other Ohio precedents discussed *supra* and must be rejected as an aberrant lower court opinion until and unless the Ohio Supreme Court embraces it.

■■■■ Thus, Ohio law does not support appellees' contention that because they have not managed the FMPC since 1985 they cannot be liable for a continuing trespass action filed in 1994. We hold only that, under Ohio law, a claim for continuing trespass may be supported by proof of continuing damages and need not be based on allegations of continuing conduct. Therefore, Nieman has stated a claim for continuing trespass sufficient to survive defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). We express no opinion at this stage of the litigation as to whether the injury alleged is abatable or whether the trespass is permanent.[14]

### F. Damages Incurred Within Statute of Limitations

■■■■ Appellees do correctly assert that if Nieman can recover damages for continuing trespass, he may only claim damages incurred within the four years prior to filing the lawsuit. *See Brown v. County Comm'rs,* 87 Ohio App.3d 704, 622 N.E.2d 1153, 1162 (1993) (where pollution is recurrent in that it is not a constant consequence of the operation or is abatable by reasonable means, "a nuisance action can be brought for damages for those injuries incurred within the applicable period"); *Wood v. American Aggregates Corp.,* 67 Ohio App.3d 41, 585 N.E.2d 970, 973 (1990) (barring plaintiffs from proving damages for a period earlier than four years prior to filing suit). Thus, Nieman's time frame for assessing damages is limited to the statute of limitations window, i.e., four years prior to the filing of the complaint in the instant action. *See Huffman,* 82 F.3d at 705 (holding, under Kentucky law, that although

---

14. The dissent concludes, at page 1566, that the trespass alleged is a "persistent residual injury from a past permanent trespass or trespasses" and, at pages 1566 and 1568, that because plaintiff neither explicitly alleged that the injury is "realistically abatable" nor sought injunctive relief, the defendant would be entitled to dismissal of plaintiff's continuing trespass claim. Although we do not foreclose the possibility that the trespass may be permanent, we would not require the plaintiff specifically to allege and prove abatability at the outset of this case to survive a motion to dismiss. Furthermore, we decline to treat the motion as one for summary judgment, especially since the defendants have provided no evidentiary support for the conclusion that the alleged trespass is *not* abatable.

The dissent also states at page 1566 that "Nieman has sought no injunctive relief, for the obvious reason that the defendants have produced no radioactive waste at the FMPC since December 1985; thus no injunction against these defendants could prevent the potential future contamination of Nieman's soil by the release of additional atomic byproducts from the FMPC." Of course, this statement would be correct if ongoing conduct by a third party were causing continuing injury to the plaintiff's property. But since that is not our case and because injunctive relief is not limited to the prohibition of conduct, defendants may be ordered to remove the uranium waste if the trespass is determined to be continuing and abatable.

a temporary nuisance claim is not barred by the statute of limitations, "recovery would be limited to damages within the limitations period immediately preceding the initiation of the action") (citations omitted); DAN B. DOBBS, REMEDIES § 5.4, at 343 (1973) (If a "trespass is 'temporary' or 'continuous,' a new cause of action arises day by day or injury by injury, with the result that the plaintiff in such a case can always recover for such damages as have accrued within the statutory period immediately prior to suit."). This restriction does not preclude Nieman from seeking damages from the appellees for the four years prior to filing suit, as long as Nieman can meet the various requirements for his cause of action. *See* RESTATEMENT (SECOND) OF TORTS § 161 (1965).

## G. Consistency With Price–Anderson Act

One final consideration not raised by the parties is whether a claim for continuing trespass, as defined by Ohio law, is inconsistent with the Price–Anderson Act. *See* 42 U.S.C. § 2014(hh). Although this issue is fundamental to the ultimate disposition of this case and is a question of law, we decline to decide it here in light of the posture of the case and the wholly undeveloped record on this point.

Initially, the Price–Anderson Act did not explicitly provide any statute of limitations.[15] In 1966, Congress amended the Price–Anderson Act to provide that with respect to any ENO, the Commission or the Secretary may incorporate provisions in indemnity agreements and insurance policies requiring licensees and contractors to waive "any issue or defense based on any statute of limitations if suit is instituted within three years from the date on which the claimant first knew, or reasonably could have known, of his injury or damage and the cause thereof, but in no event more than ten years after the nuclear incident." 1966 Amendments, Pub.L. 89–645, § 3(n), 42 U.S.C. § 2210(n)(1) (1966). Congress reasoned that "[t]he 10–year gross limitations period which this bill establishes is a more equitable time period for asserting radiation-caused personal injury claims than is afforded under the laws of many States." S.Rep. No. 89–1605 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3201, 3220.

Congress settled on ten years as "consistent with the gross period provided in the Vienna Convention on Civil Liability for Nuclear Damage (1963), the Brussels Convention on the Liability of Operators of Nuclear Ships (1962), the Paris Convention on Third-Party Liability in the Field of Nuclear Energy (1960), and the laws of several foreign countries." *Id.* Moreover, the legislative history recognizes the difficulty of establishing a "magic number" that equitably balances "the need to quiet stale claims and the need to assure victims a reasonable time in which to discover and assert their claims." 1966 U.S.C.C.A.N. at 3220–21. Significantly, the legislative history further states that the ten-year provision did not trump longer state law statutes of limitations:

> It should be noted that the 10–year period is not a maximum period for assertion of Price–Anderson covered claims, since the waiver authorized by the bill serves only to avoid the application of more restrictive State statutes of limitations. Such waiver leaves undisturbed the laws of those States which have enacted—or in the future may enact—longer periods of limitation.

1966 U.S.C.C.A.N. at 3221.

In 1975, Congress amended § 2210(n)(1) to increase the ten-year period to twenty years. Pub.L. 94–197, § 12, 42 U.S.C. § 2210(n)(1) (1975). In 1988, Congress again amended

---

**15.** After hearings in 1965, the Atomic Energy Commission undertook to study, among other things, whether Congress should enact "a uniform statute of limitations for claims covered by the Price–Anderson Act." S.Rep. No. 89–1605, *reprinted in* 1966 U.S.C.C.A.N. 3201, 3204. Addressing the subject of arguments advanced for and against the establishment of a Federal statute of limitations for injuries and damages arising from a nuclear incident, the Senate report states:

> Students of the subject agree that there is a problem: there is not only a wide variation among the States in the time allowed for asserting claims, but also a lack of recognition in many State statutes that the results of exposure to radiation may not become evident within the timespan normally allotted for more conventional injuries. The basic question, again, is whether reform should be accomplished by State or Federal law.

*Id.*, 1966 U.S.C.C.A.N. at 3208.

§ 2210(n)(1) to eliminate the twenty-year statute of limitations. Pub.L. 100–408, § 16, 42 U.S.C. § 2210(n)(1) (1988). Thus, under the 1988 amendment, "a damage suit could be filed at any time after an ENO, provided the suit is instituted within 3 years from the time that the claimant first knew, or reasonably could have known, of his injury or damages caused by the ENO." S.Rep. No. 100–70, at 21 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1424, 1434. Moreover, as with each amendment to the statute of limitations provision, this new standard was meant to "supercede any more restrictive State tort law standards in existing law with respect to statutes of limitations." *Id.*

The three-year discovery provision has not changed since the 1966 Amendments. In the instant case, it is uncontested that Nieman discovered at least part of his damages more than three years before he filed this case. However, because Ohio law provides a longer period within which Nieman could file his continuing trespass claim, if Ohio law of continuing trespass does not conflict with § 2210 as prohibited by § 2014(hh), the three-year discovery rule would not necessarily bar Nieman's Price–Anderson Act claim for continuing trespass. Moreover, we note that § 2210(n)(1) applies only to ENOs, not all nuclear incidents; therefore, presumably Congress intended not to alter the state law statutes of limitations for nuclear incidents that are not ENOs (again to the extent they are not inconsistent with § 2210 as required by § 2014). Although the various amendments to the provision regarding the waiver of issues and defenses based on statutes of limitations with respect to ENOs may provide some insight into Congressional intent, in light of the posture of this case and the fact that neither the district court nor the parties have addressed whether a continuing trespass claim that effectively extends the time for filing beyond the traditional discovery rule is consistent with § 2210 of the Price Anderson Act, we decline to decide this issue.

It could be argued that a continuing trespass claim defined by Ohio law is inconsistent with the three-year discovery rule provision in § 2210(n)(1) since Ohio law of continuing trespass allows a claimant to file suit more than three years "from the date on which the claimant first knew, or reasonably could have known, of his injury or damage and the cause thereof." 42 U.S.C. § 2210(n)(1). On the other hand, § 2210(n) previously limited the three-year discovery rule to provide an outside limit in which a claimant must institute an action, i.e., within twenty years of the date of the nuclear incident. The parties have not explored the impact of these amendments on the issue at hand, i.e., whether the amendments indicate a Congressional intent to limit the time for bringing a claim under the Price–Anderson Act or whether the elimination of an outside limitation period that begins to run on the date of the nuclear incident implies the opposite intent.[16] Nor have the parties discussed whether the fact that § 2210(n) applies only to ENOs suggests that no outside time limit should apply to nuclear incidents or, alternatively, that a shorter time limit should apply to a less significant public liability action. In fact, the parties have provided no proof that the alleged leak

---

16. The Statement of the Nuclear Regulatory Commission before the Committee on Energy and Natural Resources, which is incorporated in the legislative history on the Price–Anderson Act Amendments of 1988, states that

The Commission has consistently supported a recommendation that the Congress extend the statute of limitations for filing a public liability claim arising from a nuclear accident from 20 years to 30 years. This extension is recommended in order to provide greater assurance that latent injuries caused by a nuclear accident are provided protection under the Price–Anderson system. The Commission continues to support an increase to 30 years from the current 20–year period in which those indemnified waive a right to plead any state statute of limitations. The inherent difficulties in proving that latent injuries were caused by the nuclear accident and not by some other factor or combination of factors appear to us to argue for some final cutoff to initiation of claims once a generous allowance has been made for accommodating the discovery of those injuries. S.Rep. No. 100–70, at 46–47 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1424, 1456. Since Congress ultimately enacted no outside statute of limitations to limit the three year discovery rule, it could be inferred that Congress determined that no final cutoff was necessary. On the other hand, the underlying concern about discovery of latent injuries does not support the applicability of an Ohio law claim for continuing trespass.

constitutes an ENO or a "nuclear incident." Finally, the legislative history for each amendment relating to the statute of limitations issue stresses that the statute imposed is a *minimum* limitations period, such that it supersedes more restrictive state tort law limitations periods but does not necessarily preclude the application of a longer state statute of limitations. *See, e.g.,* S.Rep. No. 100–70, at 21 (1988), *reprinted in* 1988 U.S.C.C.A.N. at 1434. Since the parties have not developed this issue and because the district court had no occasion to address it in deciding the motion to dismiss, we decline to decide at this juncture whether Ohio law of continuing trespass is consistent with the Price–Anderson Act.

## IV. CONCLUSION

Assuming for purposes of this opinion only that Ohio's cause of action for continuing trespass is not inconsistent with the Price–Anderson Act and accepting as true Nieman's allegations, as we must in the context of reviewing a motion to dismiss, we hold that Nieman's claim for continuing trespass, if any, is not barred by the statute of limitations under Ohio law. Accordingly, we **REVERSE** the district court's grant of defendants' motion to dismiss Nieman's Price–Anderson Act claim and **AFFIRM** in all other respects.

KRUPANSKY, Circuit Judge, dissenting.

The panel majority has, inter alia, mandated that the plaintiff-appellant Anthony J. Nieman ("Nieman") may have advanced a valid and timely cause of action for a continuing trespass upon real property under the Price–Anderson Act (42 U.S.C. § 2011 *et seq.*) as informed by Ohio law. I disagree with the panel majority's resolution that the subatomic trespass allegedly committed by the defendants may have constituted a "continuing" trespass under Ohio law which was not precluded by limitations.[1] Because Nieman's third cause of action instead clearly alleged a *permanent* trespass claim which accrued upon the initial unlawful intrusion upon the plaintiff's tract (or when the plaintiff obtained actual or constructive knowledge

---

1. Ohio law incorporates the generally recognized jurisprudential distinction between "continuing" trespass and "permanent" trespass. *See, e.g., Louisville Brick & Tile Co. v. Calmelat,* 6 Ohio App. 435, 437–39 (1917). Essentially, a "permanent" trespass occurs when the defendant's tortious act has been fully accomplished but injury to the plaintiff's estate from that action persists in the absence of further conduct by the defendant, *e.g. id.* at 437; *Hamo v. Exxon Corp.,* No. 1143, 1982 WL 5760 (Ohio App. May 28, 1982); whereas a "continuing" trespass transpires when the defendant's tortious activity is ongoing, thus perpetually creating fresh violations of the plaintiff's property rights which the defendant is duty bound to cease, *e.g., Valley Ry. Co. v. Franz,* 43 Ohio St. 623, 4 N.E. 88, 90 (1885); *Boll v. Griffith,* 41 Ohio App.3d 356, 535 N.E.2d 1375 (1987).

 *See generally* 54 C.J.S. *Limitations of Actions* § 176 (1987):

 Generally, a cause of action for trespass accrues, so as to start the running of limitations, at the time the alleged trespass occurs. In the case of a continuing trespass, the statute of limitations does not begin to run from the date of the original wrong, but rather gives rise to successive causes of action each time there is an interference with a person's property, and an action is barred as to so much only of the wrong as was committed prior to the term of the limitation. Furthermore, the statute of limitations will not bar an action in trespass,

even where the trespass is discovered by plaintiff beyond the period of the statute, where the wrong continues to the present, and in such circumstances, the limitation period does not begin to run until the particular wrong ceases. However, where the result of a continuing trespass is a permanent harm, a single cause of action may be commenced to recover past and future damages and the statute of limitations runs against such cause of action from the time it first occurred, or at least from the date it should reasonably have been discovered.

(Notes omitted).

 *See also id.,* § 177:

 [I]t may be broadly stated that, where a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begins to run from, the date of the last injury, or when the tortious overt acts cease. Where the tortious act has been completed, or the tortious acts have ceased, the period of limitations will not be extended on the ground of a continuing wrong.

 A "continuing tort" is one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation, and for there to be a continuing tort there must be a continuing duty.

(Notes omitted).

of that trespass), *see Louisville Brick & Tile Co. v. Calmelat,* 6 Ohio App. 435, 437 (1917), despite his self-serving designation of that count as a continuing trespass charge, I respectfully dissent from the panel majority's disposition in part III.E. which speculates that Nieman's third cause of action may have potentially alleged a continuing trespass. Whether the plaintiff's third cause of action clearly asserts a continuing versus a permanent trespass is a question of law. Because the plaintiff's third count averred a permanent trespass which accrued in 1985, in language which is beyond conjecture, the applicable Ohio four year statute of limitations (O.R.C. § 2305.09(A)) precluded its prosecution in this 1994 action.

Between 1952 and December 31, 1985, as a government contractor, defendant-appellee National Lead of Ohio, Inc. ("NLO"), a subsidiary of defendant-appellee National Lead Industries, Inc. ("NL"), operated and managed the United States Department of Energy's uranium processing plant located in Fernald, Ohio, known as the Feed Materials Production Center ("FMPC"). *In re Fernald Litigation,* No. C–1–85–149, 1986 WL 81380, at *1 (S.D.Ohio Sept.18, 1986). Nieman owned several acres situated within five miles of that facility. On December 18, 1984, the FMPC accidentally released at least 340,000 pounds of uranium dust into the surrounding environment. *Id.*

On January 23, 1985, representatives of local residents inaugurated a class action against NL which sought damages and equitable relief corrective of resulting nuclear contamination. An amended complaint filed on or about October 28, 1985 listed Nieman and his spouse among the named class representatives. J.A. at 50. The amended complaint alleged six Price–Anderson Act causes of action partially derived from Ohio law,[2] *see* 42 U.S.C. §§ 2014(hh) & 2210, and sought class certification, actual damages in the sum of $100,000,000, punitive damages totalling $200,000,000, an injunction prohibiting further uranium processing at the FMPC, the "restoration of [the class members'] property

to the pre-leak condition[,]" and other appropriate legal and equitable remedies.

On September 18, 1986, the district court excluded all NL employees, including Nieman, from the plaintiff class. *In re Fernald Litigation,* No. C–1–85–149, 1986 WL 81380 (S.D.Ohio Sept.18, 1986). However, several relatives of Nieman, including his spouse, remained participants in the class action. Nieman elected not to pursue his individual remedies against the defendants at that time. On September 29, 1989, the trial court approved a settlement of the class action. *In re Fernald Litigation,* No. C–1–85–149, 1989 WL 267039 (S.D.Ohio Sept.29, 1989). The settlement agreement required the creation of a $73,000,000 fund to compensate class members for property value diminution and emotional distress. *Id.* at *10. However, the settlement included no provision for the environmental cleanup of anyone's property; the parties had not actually litigated any claim for the restoration of any property to its pre-irradiation condition. *Id.* at *8–9.

On November 3, 1994, over eight years after Nieman's exclusion from the class action and over nine years after his actual or constructive notice of the allegations charged against the defendants in that action, Nieman initiated his instant personal lawsuit against NLO and NL, alleging six causes of action. Counts 1, 2, 4, 5, and 6 were substantially similar to the correlating charges articulated in the amended class action complaint, whereas Nieman's third cause of action (styled "Continuing Trespass") materially diverged from the amended class action complaint's third count (denominated "Private Nuisance"), as illustrated *infra.* Nieman's complaint sought $1 million in actual damages, $1 million in punitive damages, costs, and attorneys fees, but did not request injunctive relief or the restoration of his property to its pre-accident condition.

On January 3, 1995, the defendants moved jointly for dismissal of Nieman's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, or in the alterna-

---

**2.** The amended complaint charged counts of negligence, strict liability, private nuisance, willful and wanton misconduct, violation of 42 U.S.C.

§ 2210 (the Price–Anderson Act), and the existence of contractual guarantees which averredly exposed NL to liability for NLO's actions.

tive for Fed.R.Civ.P. 56 summary judgment, asserting that limitations barred each substantive claim stated therein. Nieman countered that his third cause of action should survive because it averred a *continuing,* or ongoing, tort, which purportedly was not precluded, as to injuries which impacted his property within four years preceding the complaint's filing, by the four year limitations period governing realty trespasses (O.R.C. § 2305.09(A)), even though the trespass itself commenced more than four years prior to the complaint.[3] *See, e.g., City of Norwalk v. Blatz,* 9 Ohio C.C. (n.s.) 417, 427, 1906 WL 677 (Ohio Cir.1906).

On May 16, 1995, the trial judge dismissed Nieman's entire complaint under Fed. R.Civ.P. 12(b)(6) as facially time barred. J.A. at 141. Rejecting Nieman's proffered defense of his third cause of action, the lower court posited that the plaintiff's trespass cause of action accrued during, or prior to, 1985, because he indisputably possessed knowledge of the alleged radioactive contamination by that year. *Nieman v. NLO, Inc.,* No. C–1–94–748 (S.D.Ohio May 16, 1995) (Order) *(citing Korgel v. United States,* 619 F.2d 16, 18 & n. 4 (8th Cir.1980); *Hamo v. Exxon Corp.,* No. 1143, 1982 WL 5760 (Ohio App. May 28, 1982)). Although the district judge questioned whether the alleged trespass could properly be characterized as continuing, he did not resolve that question but instead ruled that, even if the plaintiff had alleged a continuing trespass, this cause of action accrued in 1985 because all future damages to Nieman's property from nuclear spoliation could have been estimated and prosecuted in a single action.[4]

On review, the panel majority has incorrectly mandated that a continuing trespass claim may be supported by allegations of continuing *harm* caused by a past trespass, regardless of the absence of continuing wrongful *conduct* by the defendant. Consequently, the panel majority has erroneously ruled that Nieman may sue for any *injury* impacted upon his parcel during the period not excluded by limitations, irrespective of the date or dates of the defendant's tortious actions which generated such damage. However, a proper continuing trespass count requires allegation of ongoing wrongful *conduct,* rather than mere ongoing *injury* resulting from a past, completed misdeed.

It is axiomatic that "[a] continuing tort sufficient to toll a statute of limitations is occasioned by *continual unlawful acts, NOT by continual ill effects from an original violation,* and for there to be a continuing tort there must be a continuing duty." 54 C.J.S. *Limitations of Actions* § 177 (1987) (emphasis added & notes omitted).[5] Because a continuing trespass is characterized by ongoing wrongful *conduct* which can be reasonably physically abated, continuing trespasses typically demand an injunctive remedy as a practical alternative to successive damage suits. *See, e.g., Caldwell v. Goldberg,* 43 Ohio St.2d 48, 330 N.E.2d 694, 696 (1975); *Crawford v. Rambo,* 44 Ohio St. 279, 7 N.E. 429, 434 (1886); *City of Seven Hills v. City of Cleveland,* 1 Ohio App.3d 84, 439 N.E.2d 895, 902 (1980); 88 O Jur.3d *Trespass* § 49 (1989). Generally, a trespass or nuisance can reasonably be abated where either (1) the defendant has deposited an intrusive, tangible ma-

---

**3.** By acknowledging in part III.B. of the majority opinion that "the only potentially viable state law claim in [Nieman's] complaint" was the purported claim for continuing trespass, the panel has ruled, correctly, that the other claims derived from Ohio law stated in Nieman's complaint were each fatally tardy.

**4.** This ruling need not be addressed on review because, as evolved forthwith, the alleged trespass clearly was permanent, not continuing, and hence was barred by limitations. An appellate court may affirm the lower court's judgment upon any basis supported by the law and the record. *Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970); *Russ' Kwik Car Wash, Inc. v. Mara-*

*thon Petroleum Co.,* 772 F.2d 214, 216 (6th Cir. 1985) (per curiam).

**5.** *Accord, Sable v. General Motors Corp.,* 90 F.3d 171, 176 (6th Cir.1996) (continuing pollution of the plaintiff's property caused by the effects of past, completed acts of hazardous waste dumping constituted a permanent, not a continuing, trespass, because the plaintiff can only prove continuing harmful effects from a past tortious act but cannot prove continuing tortious conduct by the defendants); *McCune v. City of Grand Rapids,* 842 F.2d 903, 905 (6th Cir.1988) ("a continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation.").

terial object, such as a structure or waste, upon the plaintiff's property, which can and should be removed by the defendant, *see Franz,* 4 N.E. at 90; *Boll v. Griffith,* 41 Ohio App.3d 356, 535 N.E.2d 1375, 1376–77 (1987) (*citing* Restatement (Second) of Torts, § 158(c) (1965)), or (2) the defendant's actions have caused an offending substance, such as water or noxious fumes, to ceaselessly invade the plaintiff's property, which damaging flow can be physically terminated or diverted by reasonable practical means, *Crawford,* 7 N.E. at 434; *Franz,* 4 N.E. at 90. *Cf. Brown v. Scioto Cty. Bd. of Commrs.,* 87 Ohio App.3d 704, 622 N.E.2d 1153, 1162 (1993).

Nieman has alleged only continuing *injury* to his tract of real property caused by radioactive byproducts released by the defendants more than four years prior to his complaint, and has not averred that the removal of this material from his property would be realistically feasible. Paragraph 9 of his November 3, 1994 complaint asserted that almost 200,000 pounds of uranium dust had escaped the FMPC by some unspecified date. Paragraph 10 then averred that, specifically, "[o]n or about December 10, 1984, a massive leak of uranium occurred at the Fernald Plant." Paragraph 11(A) vaguely alleged that additional discharges of radioactive agents from the FMPC may have occurred on unspecified dates after December 10, 1984. J.A. at 6. Nieman's third cause of action, which inter

alia incorporated paragraphs 9, 10, and 11, materially alleged that:

> 20. The Defendants, by and through releases of uranium into the air, into the groundwater, and into the underlying aquifer have created a trespass on the property of the Plaintiff that continues to this day and will continue into the foreseeable future.
>
> 21. As a direct and proximate result of the Defendants [sic] acts and omissions, the Plaintiff has been damaged in the amount of One Million Dollars ($1,000,000.00).[6]

J.A. at 8.

Any uncertainty inhering in the complaint regarding the time frame of alleged harmful irradiation can be eliminated by converting, on review, this motion to dismiss under Fed. R.Civ.P. 12(b)(6) (as it was treated by the district court) to a summary judgment motion under Fed.R.Civ.P. 56, thus permitting judicial consideration of dispositive undisputed material facts.[7] Because the October 1985 amended class action complaint included Nieman among the named representative class members, he necessarily had actual or constructive knowledge by that date of the December 10, 1984 massive radiation release and subsequent emissions from the FMPC alleged therein. In addition, because the defendants ceased operation of the FMPC

---

**6.** By comparison, the third cause of action ("Private Nuisance") of the amended class action complaint filed in October 1985 had materially averred:

> 32. The Defendant NLO unreasonably interfered with the use and enjoyment of the property of the class by collecting and processing uranium at the Fernald plant.
> 33. Upon information and belief, Plaintiffs state that NLO was at all times herein under the complete direction, domination and control of Defendant NL and that the negligent acts of NLO were caused by such direction, domination and control.
> 34. As a direct and proximate result of the Defendants NLO and NL maintaining a private nuisance, Plaintiff class is seeking a temporary and permanent injunction prohibiting further processing of uranium at the Fernald plant, or in the alternative, compensation to the Plaintiff class for the diminution of value to the class members' property, and restoration of their property to the pre-leak condition.

J.A. at 56–57.

**7.** *See* Fed.R.Civ.P. 12(b):

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside of the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

An appellate court reviews a summary judgment award de novo, using the same Rule 56 standards as the district courts. *Hansard v. Barrett,* 980 F.2d 1059, 1061 (6th Cir.1992). Where uncontradicted facts prove that limitations forestall a particular claim, all other facts are rendered immaterial, and the case is ripe for summary disposition. *Cf. Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

around December 31, 1985, Nieman's claims against the defendants must all derive from nuclear emissions which occurred prior to that date.

Nieman has sought no injunctive relief, for the obvious reason that the defendants have produced no radioactive waste at the FMPC since December 1985; thus no injunction against these defendants could prevent the potential future contamination of Nieman's soil by the release of additional atomic by-products from the FMPC. Moreover, Nieman has not sought elimination of the lingering residue of past nuclear trespasses caused by the defendants, nor has he even alleged (let alone offered evidence) that uranium dust which escaped from the FMPC over a decade ago could now be removed from his realty, or forestalled from entering his lot, by any reasonable means or currently available technology. Instead, Nieman has merely alleged in a conclusory fashion that his property continues to be tainted by radiation released during or prior to December 1985. This is not a continuing trespass but rather is a mere asserted persistent residual injury resulting from a past permanent trespass or trespasses.[8]

As conceded by the majority, *Hamo v. Exxon Corp.*, 1982 WL 5760 (Ohio App. May 28, 1982), is "factually analogous" to the cause sub judice. Although *Hamo* was a nonprecedential unpublished disposition, it (contrary to the majority's characterization) correctly reflected and applied governing Ohio trespass law and pertinent general jurisprudential principles and, as such, is an instructive exposition on the Ohio law of per-

manent versus continuing trespass. In *Hamo*, Exxon's subterranean gasoline tank ruptured in October 1972, spewing gasoline which subsequently leached into adjoining land leased by Hamo. Sometime thereafter, Hamo and his landlord presented an ultimately dishonored claim to Exxon for property damage incident to the 1972 spillage. In 1976, Hamo purchased the formerly leased land, then discovering additional permeation from the 1972 discharge and consequent additional property damage. Hamo sued Exxon for these damages in 1978. The Ohio appellate court rejected Hamo's contention that the subject trespass had continued to the date of trial, mandating that the plaintiff had filed the 1978 complaint two years out of rule (O.R.C. § 2305.09), because the gasoline leak had been discovered by Hamo in 1972. Accordingly, even "assuming that the *damage* was continuing," *id.* at *1 (emphasis added), the presence of Exxon's gasoline on the subject realty did not constitute a continuing trespass; rather, the limitations period began running upon Hamo's discovery of the initial seepage of gasoline from the 1972 spill onto the property at issue.

*Hamo* conforms to the controlling Ohio law of realty trespass. Because the plaintiff had sued only for continuing damage to his property caused by a tortious fait accompli finalized six years prior to the institution of his lawsuit, and apparently did not allege or evidence that gasoline seepage from a six year old underground spill could be practically abated, he had (tardily) alleged a permanent tort.[9] No ongoing conduct by the de-

---

8. Ohio courts have adopted a similar principle in nuisance cases. For instance, in *Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App.3d 704, 622 N.E.2d 1153 (1993), an Ohio appellate court mandated, inter alia, that an air pollution nuisance which was not practically abatable and was consistently produced is a permanent nuisance triggering limitations computation from "the time that the nuisance begins or is first noticed, provided that the permanent nature of the nuisance can be ascertained at that time." *Id.*, 622 N.E.2d at 1162. *See also Olpp v. Hocking Valley Ry.*, 22 Ohio N.P. (n.s.) 433, 439–40, 1920 WL 594 (1920) ("If it is within the power of the person by the exercise of skill and labor to abate the nuisance, he must do so. If he fails in his duty, but allows the same to continue, he is responsible for maintaining a *continuing* nui-

sance.... [However, i]f one responsible for maintaining a nuisance is unable by the exercise of skill and labor to abate it, then it is to be regarded as permanent, because it will continue indefinitely without change.") (Emphasis in original).

*Accord, Mangini v. Aerojet–General Corp.*, 12 Cal.4th 1087, 51 Cal.Rptr.2d 272, 912 P.2d 1220 (1996) (contamination by toxic waste may be categorized as a "continuing trespass" only if that contamination is abatable; if it cannot be eliminated by reasonable means at reasonable cost, the trespass is permanent, and the statute of limitations is not tolled).

9. *Accord, Mangini*, 51 Cal.Rptr.2d at 276–77, 912 P.2d at 1223–24; *Union Oil Co. of Calif. v. Prof. Realty Inv., Inc.*, 72 F.3d 130 (Table), 1995 WL

fendant contributed to the ongoing damage caused by the past incident.

The authorities cited by the panel majority similarly support the conclusion that a permanent trespass exists where the defendant trespassed the plaintiff's property with radioactive dust only on finite past occasions and where the plaintiff has not alleged (and certainly has not evidenced) that the nuclear residue on his property from these discrete past emissions can now be readily removed as a matter of practical physics and extant technological capabilities. In *Boll v. Griffith,* 41 Ohio App.3d 356, 535 N.E.2d 1375 (1987), the primary precedent relied upon by the panel majority, the court found a continuing trespass where the defendant, upon razing his structure which had adjoined a building owned by the plaintiff, abandoned debris on the party wall which over time had weakened that wall. The defendant had a continuing duty to remove the offending remnant material which he had in effect wrongfully deposited on the plaintiff's edifice. As such, the defendant had continued to trespass the plaintiff's building during each day that he (the defendant) failed to remove the subject demolition waste. Stated differently, the defendant's continual unlawful act was his failure to extract tangible, moveable matter from the plaintiff's real estate which he (the defendant) at all times had a duty to remove. *Id.,* 535 N.E.2d at 1376–77.

The panel majority's reliance upon *Valley Ry. Co. v. Franz,* 43 Ohio St. 623, 4 N.E. 88 (1885), was similarly misplaced. Plaintiff Franz had sought damages for the gradual erosion of his property caused by the defendant railroad's diversion of the Cuyahoga River in 1874. After repeated dishonored assurances by the railroad of impending correction of the problem, Franz sued in 1881.

*Id.,* 4 N.E. at 89. The Ohio Supreme Court sustained the lower court's ruling that the four year statute of limitations did not preclude Franz's action because the defendant's conduct created a continuing trespass or nuisance. *Id.* at 92. The defendant's diversion of the river resulted in the *continual* damaging invasion of the plaintiff's land by water. The defendant bore a continuing obligation to terminate the aqueous trespass, and abatement of that continuing trespass was practically feasible.[10]

The panel majority has also misconstrued *Wood v. American Aggregates Corp.,* 67 Ohio App.3d 41, 585 N.E.2d 970 (1990), wherein the Ohio court of appeals reversed a summary judgment for the defendant, resolving that a material question of fact remained whether the plaintiffs suffered damages by the *continued* unreasonable withdrawal of aquifer water by the defendant quarry. *Id.,* 585 N.E.2d at 973. In *Wood,* the plaintiffs first noticed a decline in their well water supply shortly after the defendant quarry commenced operation in 1973. In 1982, the plaintiffs' home was connected to city water lines. In 1988, six years after city water service commenced, the plaintiffs initiated litigation against the quarry. *Id.* at 972. The appellate court resolved that the tort asserted was "arguably ongoing" because the quarry allegedly *continued to remove* unreasonable quantities of subterranean water. *Id.* at 973.

The *Wood* court merely ruled that a fact question remained whether the defendant's continuing unreasonable extraction of ground water had economically harmed the plaintiffs during the actionable four year period prior to the complaint, even though the plaintiffs' house was supplied with city water during

717021, at *11 n .5 (6th Cir. Dec.5, 1995) (the tortious physical *presence* of underground gasoline storage tanks on the plaintiff's property constituted a *continuing* trespass, whereas the *contamination* caused by the seepage from the tanks constituted a *permanent* trespass); *Korgel v. United States,* 619 F.2d 16, 18 n. 4 (8th Cir.1980) (observing that most courts have concluded that a tort claim for seepage of water or petroleum accrues upon the date of the initial injury or the date upon which the initial injury became apparent or discoverable by due diligence) (*citing Mah-*

*er v. Cities Service Pipe Line Co.,* 286 F.2d 313 (10th Cir.1960)).

**10.** *Cf. Korgel,* 619 F.2d at 18, in which the Eighth Circuit found the creation of a *permanent* trespass by the government's initial action which flooded the plaintiff's farmland, despite annual infusions of additional water, because the flood waters on the plaintiff's estate had not significantly receded since the initial impact of flood waters thereon, thus creating a permanent tort completed on the initial flood date.

that entire period. *Id.* Obviously, the value of the plaintiffs' land might be diminished by the decline in the well's productivity, even following the plaintiffs' access to city water. However, the court did *not* rule that the plaintiffs could sue for continuing damage to their property occasioned solely by the defendant's overuse of underground water *more* than four years prior to the filing of the complaint. Rather, wrongful conduct continuing into the period not restricted by limitations, coupled with continuing injury to the plaintiff caused by that continuing conduct, was necessary to support a continuing trespass claim.[11]

In Ohio, "[i]t has long been the policy of the law to require that actions involving allegations of tortious conduct be asserted promptly." *Lawyers Coop. Pub. Co. v. Muething,* 65 Ohio St.3d 273, 603 N.E.2d 969, 975 (1992); *Brown,* 622 N.E.2d at 1162. The panel majority's disposition unjustifiably licenses the plaintiff to assert a stale permanent tort claim which could and should have been litigated within four years of Nieman's actual or constructive discovery of the alleged radiation emissions caused by the defendants. Instead, the plaintiff unjustifiably delayed prosecuting his cause for at least nine years after he had actual or constructive knowledge of the alleged nuclear contamination caused by the defendants.

The trespass alleged by Nieman was permanent, not continuing, because a trespass under Ohio law is "continuing" only if the trespass itself (as opposed to the harm caused by a past trespass) is continuing. Ongoing *conduct* is the key to a continuing tort. Where no continuing action by the defendant is necessary to effect the damage in controversy—that is, where the tort is an accomplished fact, such as when intangible pollutants have impacted the plaintiff's property and those contaminants cannot be physically removed as a practical matter—the tort is permanent; the defendant can have no ongoing duty to remove any substance which is physically impossible or impractical to remove.[12] On the other hand, where the harm to the plaintiff depends upon continuing action (or inaction violative of a duty to act) by the defendant, such as the defendant's perpetual failure to remove a physically removable offending object which the defendant has an ongoing duty to remove, the tort is continuing.

The most that Nieman could prove against the defendants is that his acreage continued to suffer harm on or after November 3, 1990 (the earliest date not excluded by the four year statute of limitations) consequent to the perdurable presence upon his real estate of toxic subatomic particles deposited consequent to pre-December 31, 1985 uranium dust emissions from the FMPC, which ongoing injury has not even been alleged to be realistically abatable. Nieman had actual or constructive notice of this permanent trespass prior to four years preceding the initiation of his complaint; hence his claim is

---

**11.** *Accord, Carter v. American Aggregates Corp.,* 82 Ohio App.3d 181, 611 N.E.2d 512, 514–16 (1992) (no continuing tort which tolls limitations exists where, despite alleged continuing wrongful conduct of a type which had injured the plaintiffs in the past, the plaintiffs *conceded* that the defendant's ongoing course of conduct had not actually injured them for over four years).

**12.** Despite the panel majority's assertion, the definition of "continuing trespass" articulated in section 161(1) of the Restatement (Second) of Torts (1965) is not to the contrary. That section provides:

A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it.

However, comment c to this section explains that the defendant's liability for the tortious placement of an object on the property of another continues "although *through subsequent conduct on his part* it has now become impossible or impractical to terminate the intrusion on the other's land." (Emphasis added). The supporting illustration in comment c reflects that a tortfeasor who builds an offending dam and then transfers it to another person remains liable for the ongoing flooding of the plaintiff's property even though the tortfeasor cannot now correct the problem without trespassing upon the property of the dam's new owner. Section 161(1) and comment c accordingly establish that a tortfeasor may not escape ongoing liability for a continuing tort by taking voluntary actions which restrict his ability to abate the tort. This principle is irrelevant to the proposition that the defendant can have no duty (ongoing or otherwise) to perform the physically impossible or impractical.

precluded by O.R.C. § 2305.09(A). The panel majority's contrary disposition intrudes upon the Ohio legislature's inviolable prerogative to restrict the permanent trespass action threshold to four years after the tort's commission (or four years after actual or constructive discovery by the plaintiff).

Accordingly, **I DISSENT** from the majority's construction of Nieman's third cause of action as potentially alleging a continuing tort under Ohio law, and its reversal of the trial court's dismissal of that count as prohibited by limitations. I would, therefore, affirm the trial court's dismissal of Nieman's entire complaint as untimely.