Michael ALEXANDER Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,
et al., Defendants.

No. CIV.A.01–CV–461–DCR.

United States District Court,
E.D. Kentucky.
London Division.

Sept. 6, 2002.

Michael Alexander, Butner, NC, pro se.

Jane Durkin Samuel, U.S. Attorney's Office, E.D. Kentucky, Lexington, KY, for Defendants.

## MEMORANDUM OPINION AND ORDER

REEVES, District Judge.

This matter is before the Court for consideration of the defendants' motion to dismiss or, in the alternative, for entry of summary judgment in their favor. [Record No. 22] Having reviewed this matter and found that there are no material issues of fact to be resolved, the Court will grant the motion for summary judgment for the reasons discussed below.

### BACKGROUND

On November 7, 2001, Plaintiff Michael Alexander, an individual who was then confined at the Federal Correctional Institution ("FCI") in Manchester, Kentucky, filed a *pro se* civil rights complaint under 28 U.S.C. § 1331 and pursuant to the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In his complaint, Alexander asserts that he has a medical condition with his left knee which is painful and which is fully documented throughout his medical file by prison physician assistants and two independent orthopaedic specialists. However, despite his records and the recommendations of the specialists, the named defendants at FCI–Manchester have denied him ACL reconstructive surgery to correct the problem because the original injury occurred prior to his incarceration. The plaintiff attaches to his complaint some of the documents which were exchanged in the Bureau of Prisons ("BOP") administrative remedy process the plaintiff exhausted in order to obtain the recommended surgery.

After this Court dismissed one of the named defendants and ordered that summons issue for the remaining parties [Record No. 5], the Court granted, in part, [Record No. 19] two of the plaintiff's motions to amend his complaint. The plaintiff's complaint, as amended, [Record Nos. 1, 6 and 10] has gone forward against FCI–Manchester's Warden George E. Snyder and its Medical Director, Dr. John Gonzalez–Clanton (hereafter, "Dr. Gonzalez"), in their individual and official capacities for injunctive relief("I would like the court to order the B.O.P. to provide me with surgery to repair my injuries without further delay") and in their individual capacities for damages ("for all the physical and emotional suffering that has resulted from my medical condition not being treated"). On April 19, 2002, these defendants filed the instant motion, together with a memorandum and exhibits [Record No. 22–23]. The plaintiff has filed a response [Record No. 24] and the defendants have replied with exhibits which are described as a more complete set [Record No. 32].[1]

### FACTS

The parties agree that the plaintiff injured both knees in a motorcycle accident in the 1980's and in 1988 had a tear in his anterior cruciate ligament ("ACL") in the left knee surgically repaired. The defendants contend that, since he has been in BOP custody, he has had repeated and appropriate attention and care to his knee complaints. The plaintiff, however, states

1. In a footnote, the defendants explain that there was a copying error with the exhibits accompanying their original motion and memorandum [Record No. 23], such that only one side of the plaintiff's medical records were copied. Thus, the medical records were incomplete when Dr. Gonzalez reviewed them for his declaration and when Record No. 23 was submitted to the Court. Accordingly, when the Court refers to Dr. Gonzalez's declaration, it shall be to both the original and the amended declaration found attached to Record Nos. 23 and 32. In assessing the information herein, the Court has considered the complete set of medical records accompanying Record No. 32, not Record No. 23.

that the BOP has not properly treated his knee since his first complaints of pain at FCI–Elkton, in November of 1997, He then recounts his return to the medical unit there "numerous times," until the BOP arranged an evaluation of his knee by an orthopaedic specialist. In a letter dated June 10, 1998 which was sent to the prison, Dr. J. Cletus Paumier describes the plaintiff's complaints of in "Bilateral ACL tears with significant instability" and writes a plan: "The patient will have a bottom bunk pass. He is requesting ACL reconstruction, this will be considered."

The plaintiff contends that from that evaluation in June of 1998 until his transfer to FCI–Manchester in May of 2000, he thought that he was awaiting ACL reconstructive surgery. However, once at Manchester with his pain worsening, the plaintiff alleges that he was denied a bottom bunk and otherwise met "so much opposition" that frustration and emotional problems began to set in. [Record No. 24.]

Again, the Court turns to the documents supplied by the parties. Medical records reveal that the plaintiff was initially examined at FCI–Manchester after a transfer. The following month, he was examined by orthopaedic specialist Ronald S. Dubin whose June 28, 2000 report contained the following recommendations:

> This patient indicates that this pre-existed his incarceration and I have explained to him that there is very little at this point that I can offer him. If the problems become worse we will consider re-arthroscopic surgery of his right knee for assessment as well as possible ACL repair pending arthroscopic findings. Possible repeat ACL repair of the left knee. Otherwise, p.r.n. It appears the

patients [*sic*] purpose of the visit is for a bottom bunk pass which I have deferred to the institution.

Because of Dr. Dubin's June assessment, the plaintiff was not granted his request for surgery. In August and again on October 2, 2000, the plaintiff complained to a physician's assistant that he still wanted surgery to repair the problem. However, from October 2, 2000 until June 7, 2001, the plaintiff evidently did not bring up the subject of surgery again. Likewise, he did he file for an administrative remedy on the matter. On June 7, 2001, the plaintiff appeared at sick call complaining that medication was not working to relieve the pain and he wanted another orthopaedic examination.

On June 12, 2001, the plaintiff began the BOP administrative remedy procedures with an informal request for "surgery on his knees." In writing to the defendant warden at the next level of the administrative process, the plaintiff requested "medical surgery treatment to repair a injury that is getting worse." On June 21, 2001, Warden Snyder responded that as of the previous evaluation, in June of 2000, the consulting orthopaedic specialist noted that there was little he could offer, but if the problem became worse, he would consider another arthroscopic surgery.[2] "Surgical repair of your knee was not approved since the injury occurred prior to your incarceration and the problem has not worsened," the warden noting that the plaintiff had not reported any worsening at any time from the fall of 2000 until sick call on June 7, 2001. The warden also reports that on his next medical appointment, however, on June 14, 2001, a physician's assistant at the prison did refer the

---

**2.** The Court notes that the warden's response was largely lifted from the orthopaedist's evaluation of the preceding year. Indeed, in his declaration [Record No. 23], the warden admits that he relies on his medical staff for medical issues and that one of them had drafted the administrative response based upon the plaintiff's medical records.

plaintiff for another evaluation by an orthopaedic specialist. .

On June 23, 2001, Alexander appealed the warden's response to the BOP's Regional Director, the plaintiff again requesting "to be approved for medical surgery to repair a injury that has been getting worse." Four days later, on June 27, Dr. Dubin performed the scheduled orthopaedic examination. In a report dated the same day, the doctor notes that plaintiff's "chief complaint is left knee pain," and he closes with a new recommendation: "I have recommended repeat arthroscopic surgery with possible revision of ACL tear per protocol of the institution. We will see him back once surgery is approved."

On July 3, 2001, the recommendation and request was forwarded to the Washington D.C. office which must approve prisoner surgeries. Meanwhile, the Regional Director for the Mid–Atlantic Regional Office of the BOP responded to the plaintiff's administrative appeal. By a response dated July 13, 2001, she notes that the orthopaedic specialist had recently recommended the surgery; the clinical director had agreed with the specialist's recommendations; and if the surgery request to the Office of Managed Care is approved, "you will be scheduled for the surgery."

On July 17, 2001, the plaintiff proceeded to the next and final level in the BOP administrative process by appealing to the BOP's National Office. He again requested "surgery for a medical condition that is documented in my medical records"; claimed that he was being denied proper medical treatment because the injury occurred prior to his incarceration; characterized his situation as "a case of 'deliberate indifference'"; and cited *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir.1993). Meanwhile, on August 13, 2001, the plaintiff's surgery was approved. By response

dated August 16, 2001, the administrator for national inmate appeals wrote:

> You were provided an evaluation by an orthopaedic surgeon on June 27, 2001, and have been scheduled for surgery to repair your knee. Pursuant to institutional procedures, Health Services staff will notify you when your surgery will take place.

On November 7, 2001, the plaintiff filed the instant lawsuit, asking the Court to order the BOP to provide the surgery without further delay and seeking damages. On November 16, 2001, Dr. Dubin performed the surgery on the plaintiff's left knee at the Pineville Community Hospital. The operation was described by the surgeon in the hospital's operative record as follows:

> OPERATION: Diagnostic arthroscopy, left knee with debridement ACL fibers. 2) Partial lateral menisectomy. 3) Removal of loose bodies notch.

> The patient is a 37 year old black male who is seen for evaluation of an injury to his left knee. The patient injured his knee when he fell off a motorcycle back in the 80's and apparently had his ACL repaired, not reconstructed at the University Hospital in Cleveland. The patient has not done well and has loosened up and is complaining of persistent pain and swelling of his left knee. He is felt to have re-tear of his ACL and recommended arthroscopic surgery should the ACL tear be seen and documented and the possibility of reconstructive surgery was discussed.

The Operative Report also contains a section entitled "Summary of the Procedure," in which the doctor describes in detail what he found, including the torn ACL, and what he did with regard to each finding.

Afterwards, the plaintiff states that he was on crutches and excused from work

until January 8, 2002, when he resumed his regular work detail. A month later, on February 22, 2002, he was transferred from FCI–Manchester to FCI–Butner, where he claims that as of the date of signing his response herein, May 3, 2002, his condition continues to worsen and he continues to await ACL reconstructive surgery which has been intentionally, delayed.

### Defendants' Motion to Dismiss or for Summary Judgment

The defendants have moved to dismiss or, in the alternative, for summary judgment [Record No. 22], relying on a memorandum [Record No. 23] which has numerous exhibits attached. They first urge dismissal of the plaintiff's claim for injunctive relief on the grounds that the plaintiff's one request for injunctive relief, *i.e.*, arthroscopic surgery on his knee, has been granted. As there is no case controversy remaining as to that request, they argue that the Court should dismiss the injunctive portion of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1).

Next, the defendants contend that the plaintiff fails to state a claim upon which relief may be granted; therefore, dismissal is appropriate pursuant to Rule 12(b)(6). The defendants maintain that the plaintiff has failed to show any unnecessary suffering brought about by either of the defendants' deliberate indifference to his needs. Defendant Snyder is not alleged to have any actual knowledge of the plaintiff's medical condition and he may not be held liable under a theory of *respondeat superior*. Dr. Gonzalez is not alleged to have known of a serious condition and knowingly ignored it. Rather, the only claim against him is that he first held the medical view that surgery was not necessary but later changed his mind. Alternatively, the defendants claim that they are entitled to judgment as a matter of law under the standard for an Eighth Amendment claim as set by the Supreme Court of the United States in *Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Court later explained that with regard to the subjective component of such a claim, the deliberate indifference standard, it is "obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by the cruel and unusual punishment clause." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

Citing well-established Supreme Court and Sixth Circuit authority, the defendants insist that there is no evidence that either of them had the culpable state of mind necessary to state a claim. They also rely upon the plaintiff's attached medical file as showing treatment on numerous occasions by BOP medical staff; Dr. Gonzalez's declaration as to his treatment and history of following the orthopaedists' recommendations; and the declaration of Warden Snyder, who had no direct involvement with the plaintiff's medical treatment and whose only personal involvement was in the administrative remedy response he signed after medical staff drafted it. The defendants insist that, because the plaintiff cannot show a violation of a clearly established constitutional right by either of the defendants, the complaint should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) or judgment should be entered in their favor, as there are no issues of fact remaining and they are entitled to judgment as a matter of law pursuant to Rule 56(c). Finally, the defendants argue that they are entitled to qualified immunity under the standard enunciated by the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

*The Plaintiff's Response To
The Requested Relief*

In his response [Record No. 24], the plaintiff contends that the defendants are wrong about the surgery he received. He asserts that has *not* received the injunctive relief he sought:

> On 11/16/2001 I was mysteriously taken to an outside hospital, where I was seen by Dr. Dubin the same doctor that evaluated me twice and stated that I needed a ACL reconstruction surgery.... I was only there for a diagnostic, merely the procedure of taking an extensive look at the knee, a minor scope, of the left knee. I never received the highly recommended ACL reconstruction surgery and Dr. Dubin stated that he was not authorized to perform this procedure at this time, but he would once again recommend it to the FCI Manchester medical staff.... The medical staff of FIC Manchester assumed that I had the ACL reconstruction surgery on 11/16/2001.

*Id.* at 6. The plaintiff insists that he has received "little or no real medical care for my left knee problem." Relying upon Dr. Paumier's evaluation in 1998 and alleged conversations with Dr. Dubin since then, the plaintiff claims that the only treatment he received was on November 16, 2001; that procedure was only "a scope" of his knee; and he received the scope only because he filed this lawsuit. He has still not had a correction of his left knee problems because he has received only arthroscopic surgery and has still not had reconstruction surgery. He attaches copies of the orthopaedists' reports from 1998, 2000 and 2001; the operative record from the hospital describing the procedure performed by Dr. Dubin on November 16, 2001; his own affidavit conveying his version of the facts; and the originals of his appeals and the BOP's responses thereto as he went through the administrative process to exhaustion. He maintains that his condition continues to worsen, and consequently, he suffers pain, depression, and frustration in his attempt to get relief.

*The Defendants' Reply*

Providing an amended declaration of Dr. Gonzalez and a more complete set of the plaintiff's medical file, the defendants have filed a reply [Record No. 32] with five counter-arguments. First, they insist that the plaintiff's complaints about his care at FCI–Elkton are not relevant to the instant lawsuit against the FCI–Manchester defendants. Next, they insist that the plaintiff did not arrive at Manchester with a recommendation for reconstructive surgery, the defendants pointing to the same 1998 report by Dr. Paumier, which speaks for itself. Third, these defendants maintain that at FCIManchester the plaintiff did get repeated appropriate treatment for his knee-related complaints; did get a bottom bunk pass; and did get two consultations with a specialist. After the first evaluation, when Dr. Dubin noted that there was nothing he could do for him at this time and Dr. Gonzalez deferred to that opinion by denying surgery in September of 2000, the plaintiff made no complaints about his care from October of 2000 until June 7 of 2001, when he presented himself at sick call insisting that his medication was not working and he wanted another evaluation. He got that evaluation later that month.

After Dr. Dubin's very different evaluation this time, Dr. Gonzalez again deferred to the specialist's judgment, and the plaintiff received the arthroscopic surgery the doctor had recommended. Accordingly, the plaintiff received care, just not the specific type of surgery he demanded, the defendants citing to cases holding that a difference of opinion between a patient and

a doctor does not amount to an Eighth Amendment violation and distinguishing *Watson v. Caton.*

Fourth, the defendants dismiss the plaintiff's suggestion that the timing of his surgery was in response to the instant lawsuit as "a figment of his imagination and not factually supported." *Id.* at 10. Finally, the defendants examine the plaintiff's claim that he still has not received the care he requested: an ACL reconstruction. They insist that the procedure Dr. Dubin performed on November 16, 2001, was a diagnostic arthroscopy, which was exactly what Dr. Dubin had recommended and which received approval from Washington. Moreover, the detailed description of the procedure reveals that the operation did not consist of merely looking at the knee. The doctor also performed debridement of ACL fibers, a partial lateral meniscectomy and removal of loose bodies, followed by flushing out of the area. Defendants insist that the reconstruction was to be considered afterwards, depending upon the findings of the arthroscopic surgery. After his convalescent period, however, the plaintiff was transferred away from FCI–Manchester in February. He is now under the care of the staff at Butner FCI and has admitted that he is slated for evaluation there for the ACL reconstruction. Accordingly, even if ordered by this Court, the instant defendants could not provide the actual reconstruction surgery.

## DISCUSSION

### Standards for Dismissal/Summary Judgment

Fed.R.Civ.P. 12(b) provides for the dismissal of claims and parties for seven listed reasons. Subsection (b)(6) provides for dismissal for failure to state a claim upon which relief can be granted. Thereafter

Rule 12(b) continues, in pertinent part, as follows:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

*Id.* Thus, the plain language of Rule 12(b) permits a 12(b)(6) motion to be converted into a motion for summary judgment. Fed.R.Civ.P. 12(b); *Haase v. Sessions,* 835 F.2d 902, 905 (D.C.Cir.1987). As to what matters may be considered under this subsection, see also 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1357 (2nd ed. 1990) ("In determining whether to grant a Rule 12(b)(6) motion, the Court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.") (cited in *Nieman v. NLO Inc., et al.,* 108 F.3d 1546 (6th Cir. 1997)).

If affidavits go to the underlying claim and the Court considers them pertinent to its ruling on a Rule 12(b)(6) motion for failure to state a claim, then, under the plain language of Rule 12(b), the Court "shall" convert the motion into one for summary judgment pursuant to Rule 56. As the moving defendants herein have submitted declarations with numerous exhibits which the Court has considered in evaluating the pending motion, summary judgment standards will be applied.

In determining a motion for summary judgment, the Court must determine

whether there are "no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Supreme Court has directed that a court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The significant question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–53, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of showing there is an absence of evidence to support a claim. *Celotex*, 477 U.S. at 324–25, 106 S.Ct. 2548. After a moving party carries its burden, the non-moving party must go beyond the pleadings to designate by affidavits, depositions, answers to interrogatories, and admissions on file, specific facts showing that there is a genuine issue of material fact for trial. *Id.* With these standards in mind, the Court turns its attention to the defendants' motion.

### Eighth Amendment Standards

■■■ The Supreme Court has held that "[i]n order to state a cognizable claim [under the Eighth Amendment with regard to medical care] a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to the plaintiff's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Therefore, a prisoner must show both "deliberate indifference" and "serious medical needs." *Id.* Deliberate indifference may be "manifested by prison doctors in their response to a prisoner's needs or by prison [staff] in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104, 97 S.Ct. 285.

A prisoner states a proper Eighth Amendment claim "when he alleges that prison authorities have *denied* reasonable requests for treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury." *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir.1976). A deliberate refusal on the part of prison officials to provide an inmate with prescribed medication may demonstrate such deliberate indifference. *See Boretti v. Wiscomb*, 930 F.2d 1150, 1154–55 (6th Cir.1991); *Byrd v. Wilson*, 701 F.2d 592, 595 (6th Cir.1983) (per curiam).

The proper analysis of the components of an Eighth Amendment deliberate indifference to serious medical needs claim has been restated as follows:

> The Supreme Court recently clarified this inquiry, noting that the deliberate indifference standard contains both an objective component (was the deprivation sufficiently serious?) and a subjective component (did the officials act with a sufficiently culpable state of mind?). *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271, 279 (1991).

*Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir.1992). Deliberate indifference has been defined as "more than mere negligence, but 'something less than acts or

omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Foy v. City of Berea,* 58 F.3d 227, 232 (6th Cir.1995) (quoting *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994)).

■ However, allegations of medical malpractice or negligent diagnosis and treatment are not cognizable under § 1983. *See Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. 285; *Birrell v. Brown,* 867 F.2d 956, 958 (6th Cir.1989). Moreover, when a plaintiff claims deliberate indifference to his serious medical needs but the case involves a difference of opinion between the plaintiff and a doctor regarding the plaintiff's diagnosis and treatment, no claim is stated. *Estelle v. Gamble,* 429 U.S. at 107; *Westlake v. Lucas,* 537 F.2d at 860 n. 5. Additionally, a recommendation of elective treatment does not necessarily indicate a serious medical need. *See Boring v. Kozakiewicz,* 833 F.2d 468 (3d Cir.1987).

Because the defendants contend both that the plaintiff has failed to meet the applicable standards for stating a prisoner Eighth Amendment claim and that they are entitled to qualified immunity, the Court also examines the standard for such immunity. Qualified immunity is described by the Supreme Court of the United States as follows: "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Sixth Circuit has consistently set out a tripartite procedure for evaluating claims of qualified immunity, the first step of which is to determine whether a constitutional violation occurred. *See Dickerson v. McClellan,* 101 F.3d 1151, 1157–58 (6th Cir.1996).

■ Therefore, the initial question of whether the named defendants are entitled to qualified immunity or can be held liable for damages, which are sought and defended against herein, is the same as the initial question in another of the defendants' defenses against both injunctive relief and damages, *i.e.,* whether a constitutional violation occurred. *See Williams v. Mehra,* 186 F.3d 685 (6th Cir.1999). The plaintiff has the burden of establishing that his rights were violated and that the defendants are not entitled to qualified immunity. *Wegener v. Covington,* 933 F.2d 390, 392 (6th Cir.1991).

■ In the instant case, the Court finds that the plaintiff has failed to establish that his constitutional rights were violated by either of the defendants. Even if the Court assumes that his left knee is so painful that it constitutes a serious medical need, the plaintiff has not presented any evidence of the subjective component necessary for establishing an Eighth Amendment claim, *i.e.,* the defendants' deliberate indifference. Although the plaintiff broadly alleges, even verifies, his belief that the defendants were deliberately indifferent to his serious medical needs with regard to his knee, the exhibits and declarations before the Court for consideration reveal to the contrary. Both of the defendants responded to the instant plaintiff's complaints—not in the way he wished, but they responded; their responses are laid out herein; and they do not demonstrate the requisite culpable state of mind on the part of either defendant. At most, the plaintiff charges that Warden Snyder had knowledge of a serious condition because he signed the response in the administrative remedy process and that he demonstrated deliberate indifference because he denied surgery at that time, when a spe-

cialist was scheduled to evaluate the plaintiff in a few days. The Court finds that the warden cannot be found to have committed a constitutional tort against the plaintiff for denying the administrative appeal and relying on medical experts to do so. See Curry v. Scott, 249 F.3d 493 (6th Cir.2001).

Regarding the other defendant, Dr. Gonzalez has treated the plaintiff himself, has relied on his physician assistants and orthopaedic specialists, and has obtained the necessary approval for the surgery recommended by the specialist. The following time frame alone reveals medical attention that cannot be called deliberate indifference to the plaintiff's knee condition. From the time of the plaintiff's arrival at FCI–Manchester until his first evaluation by Dr. Dubin, only one month passed. Thereafter, when he was disappointed the doctor had not recommended surgery in the fall of 2000, the plaintiff did not commence an administrative effort or otherwise bring to anyone's attention that he wanted another evaluation or surgery until June 7 of the following year. And even when he did so, there was less than a month from the time that the plaintiff requested another evaluation for possible surgery until that evaluation was performed by Dr. Dubin. Additionally, from the time of that evaluation until actual performance of the recommended surgery was less than 5 months, even though that time frame had to include obtaining authorization from Washington and scheduling with both a doctor and a hospital. Clearly, there is no evidence of Dr. Gonzalez's being deliberately indifferent to the plaintiff's serious medical needs. Additionally, all along the way, the plaintiff received attention at the prison for other medical complaints; was given medical excuses from his work duties; and was provided pain medication, some which the plaintiff reported was helping him in August of 2000 and some which evidently sufficed to some extent thereafter because the plaintiff did not complain again until June 7, 2001, when he said the medicine was not working.

According to the evidence before this Court, neither defendant has been shown to have been deliberately indifferent to the plaintiff's serious needs or to have "knowingly acquiesced" in any unconstitutional conduct by anyone else. See Birrell v. Brown, 867 F.2d at 958. While it appears that the plaintiff has not gotten what he wants, what he wants is not the issue. Ordering a specific type of surgery is not the appropriate function of this Court. The Court agrees with the defendants that, at most the plaintiff has alleged a difference in opinion between the plaintiff and his health care providers regarding the expediency of a specific treatment. This does not generally create a constitutional claim. See Tolbert v. Eyman, 434 F.2d 625 (9th Cir.1970); Byrd v. Wilson, 701 F.2d 592 (6th Cir.1983). And it certainly does not in the instant case.

The dismissal of this action is consistent with the results obtained by other courts faced with other prisoners' complaints that a torn ACL was not being treated to suit them. In addition to the cases cited by the defendants, including Moraga v. Kaiser, 28 F.3d 107, 1994 WL 247093 (9th Cir.1994) (unpublished) (the Ninth Circuit affirming the grant of summary judgment for prison doctors even though reconstructive surgery had been recommended twice and was still being delayed, so far for more than 16 months), Taylor v. Dutton, 85 F.3d 632, 1996 WL 253856 (7th cir.1996) (unpublished) (affirming grant of summary judgment to prison doctor and health care administrator; agreeing that the provision of wraps, ice, injections, and medical "lay-ins" constituted treatment; and finding mere differences of opinion, even by experts who

examined the prisoner, on whether arthroscopic surgery would be beneficial), *Espinal v. Coughlin*, 1999 WL 387435 (S.D.N.Y.1999) (unpublished) (Rule 12(b)(6) dismissal of several prison doctors who treated knee problems conservatively with medications and diagnostic tests, the district court finding only a difference of opinion about the appropriateness of a certain course of treatment); and *Espinal v. Coughlin*, 2002 WL 10450 (S.D.N.Y.2002) (not reported in F.Supp.2d) (granting summary judgment to the remainder of the prison doctors, on the grounds that an Eighth Amendment claim was not presented, in facts showing a mere disagreement with a course of treatment, a 3–year delay from the prisoner's complaints about his knee until reconstructive surgery was performed, and a conservative course of treatment during that time).

Thus, under all applicable standards, this Court concludes that the plaintiff has not stated a claim against Dr. Gonzalez or Warden Snyder upon which relief may be granted. Moreover, on the showing before the Court, no reasonable jury could conclude that either defendant was deliberately indifferent to Plaintiff's medical needs.

### CONCLUSION

Accordingly, there being no issue of material fact and the Court having concluded that the defendants are entitled to judgment as a matter of law, it is hereby ORDERED as follows:

(1) The defendants' motion for summary judgment [Record No. 22] is GRANTED.

(2) This action is DISMISSED and Judgment shall be entered in favor of the defendants.